**BP CHEMICALS, INC., Appellant,**

v.

**AEP TEXAS CENTRAL COMPANY formerly known as Central Power and Light Company, Appellee.**

**No. 13–05–534–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

Aug. 3, 2006.

Hayden Burns, Thomas A. Zabel, Burns, Wooley, Marseglia & Zabel, LLP, Justin Whitley, Houston, for appellant.

Robert C. Lesesne, Kenneth C. Raney, Dallas, G. Don Schauer, Schauer, Simank & Ledbetter, Corpus Christi, for appellee.

Before Chief Justice VALDEZ and Justices YAÑEZ and CASTILLO.

## OPINION

Opinion by Justice CASTILLO.

Appellant, BP Chemicals, Inc. ("BP"), appeals from the trial court order denying its motion for summary judgment and granting the motion for summary judgment of appellee, AEP Texas Central Company ("AEP"), formerly known as Central Power and Light Company ("CP & L"). We affirm.

## I. Background

BP operates a co-generation facility known as the Green Lake Plant in Calhoun County, Texas. "Co-generation involves the simultaneous production of electrical power and thermal energy, such as heat or steam, usually at an industrial site." *Pub. Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 203 (Tex.1991). Congress, in order to promote energy conservation, requires electric utilities to purchase co-generated electricity from qualifying facilities, such as the Green Lake Plant, and to provide back-up power to those facilities on a nondiscriminatory basis. *See* the Public Utility Regulatory Policies Act ("PURPA"), 16 U.S.C.A. § 824a–3 (West 2000).

In 1999, the Texas Legislature passed Senate Bill 7, amending the Public Utility Regulatory Act ("PURA") and deregulating the Texas electricity market.[1] Deregulation required each integrated electric utility to partition itself into three companies: (1) a power generation company, (2) a transmission and distribution provider, and (3) a retail electric provider.[2] The Public Utility Commission of Texas ("PUC") was given jurisdiction over the Texas electricity market,[3] and it closely regulates the transmission component of the industry.[4] Rates for power are now determined by a competitive market.[5]

Texas operates an independent and self-contained electric production and transmission grid; its system operator is the Electric Reliability Council of Texas ("ERCOT").[6] ERCOT is charged with ensuring system reliability, nondiscriminatory access to the transmission and distribution system, access to market information, and

---

1. *See* Act of May 27,1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2542, 2542–2635 (codified at TEX. UTIL. CODE ANN. §§ 39.001–.910 (Vernon Supp.2005)) (hereinafter the "Act").

2. TEX. UTIL. CODE ANN. §§ 39.051 (Vernon Supp.2005).

3. *See Tex. Commercial Energy v. TXU Energy, Inc.*, No. C–03–249, 2004 WL 1777597, at *1–*2, 2004 U.S. Dist. LEXIS 13908, at *8–*9, 2004–2 Trade Cas. (CCH) ¶ 74,497 (S.D.Tex. June 24, 2004), *aff'd*, 413 F.3d 503 (5th Cir. 2005).

4. *TXU Generation Co. v. Pub. Util. Comm'n*, 165 S.W.3d 821, 827 (Tex.App.-Austin 2005, no pet.).

5. *Tex. Commercial Energy*, 2004 WL 1777597, at *1, 2004 U.S. Dist. LEXIS 13908, at *9.

6. TEX. UTIL. CODE ANN. § 39.151 (Vernon Supp. 2005); *Tex. Commercial Energy*, 2004 WL 1777597, at *2, 2004 U.S. Dist. LEXIS 13908, at *9.

clearance of all market transactions.[7] ERCOT is also required to ensure accurate accounting of electricity production and delivery between generators and wholesale buyers and sellers in the region.[8] In conjunction therewith, "ERCOT Procotols" have been developed which provide the framework for the administration of the Texas electricity market.[9] Utilities are required to abide by the procedures established by ERCOT. *See* Tex. Util. Code Ann. § 39.151(j) (Vernon Supp.2005); *Hammack v. Pub. Util. Comm'n of Tex.*, 131 S.W.3d 713, 718 (Tex.App.-Austin 2004, pet. denied).

Beginning in 1981, BP and AEP[10] entered into a series of contracts, by which CP & L agreed to take and pay for excess electricity generated at the plant. The parties operated successfully under these contracts until 2001. Because of deregulation, and the need for CP & L to "unbundle" its integrated services into separate companies, notice of cancellation of the contract was provided to BP on November 29, 2001, effective December 21, 2001. CP & L's business was unbundled effective January 1, 2002. Until then, it continued to operate as a utility generating, purchasing, transmitting, and selling electricity to retail customers.

However, beginning in August 2001, CP & L failed to pay BP for power transferred to CP & L by BP at the Green Lake Plant meter (the point of delivery). BP delivered 7,505 megawatt hours ("Mwh") of electricity through the CP & L meters at the Green Lake Plant during August 2001. From September 1 through September 25, 2001, BP delivered 5,591 Mwh of electricity to the meters. The total adjusted avoided energy cost for these two months was $314,920.63 ($206,620.16 plus $108,300.47).[11]

When AEP did not pay for the power delivered during August and September, BP registered with the ERCOT transmission grid to sell its excess power to third parties. BP registered with ERCOT on September 1, 2001, and designated a Qualified Scheduling Entity on September 17, 2001. ERCOT first recognized deliveries from the Green Lake Plant beginning September 26, 2001. On October 1, 2001, BP executed a resource agreement with ERCOT. The difference between the monies BP received for the sale of its power between September 26, 2001, and December 31, 2001, and the monies that would have been due from AEP pursuant to the contracts totals $118,541.73.

On August 4, 2003, BP brought suit against AEP for breach of contract based on nonpayment for electrical Mwh delivered during August and September, and the additional loss when BP was forced to

7. Tex. Util. Code Ann. § 39.151 (Vernon Sup. 2005); *Tex. Commercial Energy*, 2004 WL 1777597, at *2, 2004 U.S. Dist. LEXIS 13908, at *9.

8. Tex. Util. Code Ann. § 39.151 (Vernon Supp. 2005).

9. *Tex. Commercial Energy*, 2004 WL 1777597, at *2, 2004 U.S. Dist. LEXIS 13908, at *9.

10. The contracts in issue between BP & AEP were initially entered into by their predecessors in interest, Vistron Corp. and, later, Sohio Chemicals Corp. for BP, and CP & L for

AEP. CP & L provided electric power to the Green Lake Plant and also purchased, generated, transmitted, distributed, and sold electric power in Texas. The contract was modified at different times over the years to adjust the means of calculating costs to be paid for BP's excess power, based upon adjusted avoided energy costs.

11. The parties do not dispute the amount of electricity metered during the periods in dispute. There is also no dispute as to the calculated values of the adjusted avoided energy costs, as they would be determined pursuant to formulas set forth in the contracts.

mitigate its damages and seek alternative purchasers during the remainder of the year 2001. BP included an alternative cause of action for unjust enrichment or assumpsit. AEP's answer to the suit includes the affirmative defenses of failure of consideration [12] and excuse from performance as a result of commercial impracticability, impossibility of performance, and/or frustration of purpose.[13]

The basic facts are undisputed between the parties. BP filed a motion for summary judgment on March 30, 2005, for breach of contract and principal damages in the amount of $433,462.36, plus attorneys fees and pre- and post-judgment interest.

On May 10, 2005, AEP filed its response to BP's motion and its own motion for summary judgment. AEP alleged that BP had failed to timely comply with ERCOT Protocols, including registration and designation of a Qualified Scheduling Entity, and that failure to do so prohibited AEP from either recognizing deliveries from, or transmitting any power from BP's plant on the ERCOT grid for the benefit of either BP or AEP. AEP alleged that while all unbundling did not have to be accomplished until January 1, 2002, the ERCOT Protocols requiring registration and scheduling became effective July 6, 2001.

BP responded to AEP's motion on May 24, 2005, arguing the following: (1) utilities were not required to and CP & L did not unbundle its business activities until January 1, 2002; (2) nothing made it impossible or impractical for BP's deliveries to be received or compensated; and (3) BP's

deliveries, being directly through meters at exit of the Green Lake Plant, did not require any "transmission" on the ERCOT grid and, therefore, no ERCOT Protocols were triggered or violated.

A hearing on the motions for summary judgment was held June 1, 2005.[14] The trial court issued a letter to the parties on June 30, 2005, indicating its intent to deny BP's motion for summary judgment and grant AEP's motion for summary judgment. The formal order was signed August 3 and entered of record August 4, 2005. This appeal ensued.

## II. Issues on Appeal

BP brings six issues which can be grouped according to the key arguments presented: (1) with respect to the August and September deliveries, did the trial court err when it determined that deregulation of the Texas electrical environment relieved AEP of its contractual obligation to take and pay for excess power generated at the Green Lake Plant based on AEP's affirmative defense of commercial impracticability (issues one, two, three and five); and (2) did the trial court err in concluding, with respect to the loss in sales sustained by BP for power sold to third parties between September 26 and December 31, 2001, that (a) AEP prevailed on its affirmative defense of failure of consideration (issues four and five), and (b) that no fact issues remained to preclude summary judgment (issues six and five).[15]

We consider that key questions before this Court include the following: (1) whether ERCOT Protocols requiring reg-

---

**12.** This affirmative defense was included in AEP's first amended answer filed May 10, 2005.

**13.** This affirmative defense was included in AEP's supplemental answer filed May 24, 2005.

**14.** No reporter's record of those proceedings has been provided to this Court.

**15.** Issue five asks whether the trial court erred in granting AEP's motion for summary judgment.

istration by a Qualifying Facility, Resource Entity, and/or Load Serving Entity[16] and designation of a Qualified Scheduling Entity became effective July 6, 2001, or January 1, 2002; (2) whether transfer of electricity from BP directly to the CP & L meter at the Green Lake Plant constituted "transmission" on the electric grid as that term is understood by Senate Bill 7, the Texas Utility Code, and the ERCOT Protocols; (3) whether any failure of BP to comply with ERCOT Protocols rendered it impossible or commercially impracticable for AEP to either capture or resell the electricity from BP, such that AEP was excused from its contractual obligations; and (4) whether AEP indicated it would refuse to take delivery of excess power after September 25, 2001, such that BP was justified in seeking alternative markets, or whether fact issues remain that preclude summary judgment on that issue.

## III. Standard of Review

The function of summary judgment is to eliminate patently unmeritorious claims and defenses, not to deprive litigants of the right to a jury trial. *Alaniz v. Hoyt*, 105 S.W.3d 330, 344 (Tex.App.-Corpus Christi 2003, no pet.). We review a summary judgment de novo to determine whether a party established its right to prevail as a matter of law. *Provident Life and Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (2003); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 771 (Tex.App.-Corpus Christi 2003, no pet.).

We review the evidence "in the light most favorable to the nonmovant." *See KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1995); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex.App.-Corpus Christi 2003, no pet.). We do not disregard evidence in support of the motion, but examine the entire record, indulging every reasonable inference and resolving any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex.2005). The movant bears the burden of showing both no genuine issue of material fact and entitlement to judgment as a matter of law. *Alaniz*, 105 S.W.3d at 345. We affirm a trial court's ruling on a summary-judgment motion if any of the theories advanced in the motion are meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993).

The non-movant has the burden to respond to a traditional summary-judgment motion if the movant conclusively (1) establishes each element of its cause of action or defense, or (2) negates at least one element of the non-movant's cause of action or defense. *Hoyt*, 105 S.W.3d at 345. Thus, summary judgment for a defendant is proper if the defendant disproves at least one element of each of the plaintiff's claims or affirmatively establishes each element of an affirmative defense to each claim. *Id.* Where both sides move for summary judgment and the trial court grants one motion and denies the other, we review both parties' summary-judgment evidence and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

Matters of statutory interpretation are questions of law, over which we exercise de novo review. *See Sw. Pub. Serv. Co./ Pub. Util. Comm'n of Tex. v. Pub. Util. Comm'n of Tex.*, 962 S.W.2d 207, 212 (Tex. App.-Austin 1998, pet. denied); *Groomes v.*

---

**16.** Each term describing BP's status is specifically defined in the ERCOT Protocols; it is undisputed that at the point when BP sought access to the transmission grid, it was required to register and make the proper designations.

*USH of Timberlawn, Inc.*, 170 S.W.3d 802, 804 (Tex.App.-Dallas 2005, no pet.). The primary rule of statutory interpretation is that a court must look to the intent of the legislature and must construe the statute so as to give effect to that intent. *Lee–Hickman's Invs. v. Alpha Invesco Corp.*, 139 S.W.3d 698, 700 (Tex.App.-Corpus Christi 2004, no pet.) (citing *City of Austin v. L.S. Ranch, Ltd.*, 970 S.W.2d 750, 752 (Tex.App.-Austin 1998, no writ). We construe the text of an administrative rule under the same principles as if it were a statute. *Phillips Petroleum Co. v. Tex. Comm'n on Envtl. Quality*, 121 S.W.3d 502, 507 (Tex.App.-Austin 2003, no pet.)). We further recognize that the legislature intends an agency created to centralize expertise in a certain regulatory area "be given a large degree of latitude in the methods it uses to accomplish its regulatory function." *Id.* at 507–08 (citing *Reliant Energy, Inc. v. Pub. Util. Comm'n*, 62 S.W.3d 833, 838 (Tex.App.-Austin 2001, no pet.)); *see State v. Pub. Util. Comm'n*, 883 S.W.2d 190, 197 (Tex.1994).

## IV. Analysis

### A. The August–September Transfers of Electricity

Several issues raised by BP deal with the transfer of electricity from BP's Green Lake Plant to AEP during the months of August and September 2001. The number of Mwh of electricity transferred is undisputed, as are the monies that would have been due for those Mwh under the contracts. Also undisputed are the following facts: (1) the transfers, i.e., deliveries, were effected at a meter belonging to AEP located at the Green Lake Plant; (2) CP &

L (i.e., AEP) had not yet unbundled its services; and (3) BP had not yet registered with ERCOT.

### 1. Effective Date of Relevant ERCOT Protocols

The statute passed by the Texas Legislature required deregulation and unbundling of the Texas electricity market by January 1, 2002. TEX. UTIL. CODE ANN. §§ 39.001(b)(1), 39.051(b) (Vernon Supp. 2005). ERCOT Protocols were issued June 6, 2001, and provide the following:

> These Protocols shall be fully effective on January 2, 2002; provided, however, that individual sections of these Protocols, or portions thereof, shall be effective on the earlier or later dates as necessary to support the Market Implementation Plan and the Protocols Implementation Plan as each is approved by the ERCOT Board and in accordance with applicable laws and regulations. The Sections of these Protocols related to the implementation of the wholesale market under a single Control Area shall be effective on July 6, 2001. All Market Participants (including TDSPs, Resources, Load Serving Entities, QSEs, and NOIEs)[17] intending to participate in any aspect of the wholesale or pilot retail market sharing on July 6, 2001, must register with ERCOT in time to perform under these Protocols as of July 6, 2001.

ERCOT Protocol 1.7. Clearly, portions of the ERCOT Protocols, including those requiring registration that are at issue in this suit, were effective July 6, 2001. The protocols required registration if a market participant, including one of the type of

**17.** The ERCOT Protocols include an extensive list of various definitions for acronyms such as these. The parties do not disagree that BP's Green Lake Plant, as a Qualifying Facility, fit the definitions, among others, of Re-source and Load Serving Entity. It is undisputed that at the point when BP sought access to the transmission grid, it was required to register and make the proper designations.

BP's Green Lake facility, intended to "participate in any aspect of the wholesale or pilot retail market sharing." *Id.*

## 2. "Transmission" on the Texas Electric Grid and the Need to Register

BP argues that because it only "transferred" excess power to AEP at the meter located at the Green Lake plant, it did not "transmit" power on the ERCOT grid and, therefore, no requirement for registration was triggered. AEP counters that the entire system automatically became part of the ERCOT grid, and that compliance with the ERCOT Protocols was a necessary prerequisite to any delivery of power.

The substantive rules define transmission service as the following:

> Service that allows a transmission service customer to use the transmission and distribution facilities of electric utilities, electric cooperatives and municipally owned utilities to efficiently and economically utilize generation resources to reliably serve its loads and to deliver power to another transmission service customer. Includes construction or enlargement of facilities, transmission over distribution facilities, control area services, scheduling resources, regulation services, reactive power support, voltage control, provision of operating reserves, and any other associated electrical service the commission determines appropriate, except that, on and after the implementation of customer choice in any portion of the Electric Reliability Council of Texas (ERCOT) region, control area services, scheduling resources, regulation services, provision of operating reserves, and reactive power support, voltage control and other services provided by generation resources are not "transmission service."

16 TEX. ADMIN. CODE § 25.5(141) (2006). The "nature" of transmission service is described as follows:

> Transmission service allows for power delivery from generation resources to serve loads, inside and outside of the ERCOT region. Service provided pursuant to Division 1 of this subchapter permits ... power generating companies, qualifying scheduling entities, retail electric providers (REPs), qualifying facilities, and distribution service providers (DSPs) to use the transmission system of the TSPs in ERCOT....

*Id.* § 25.191(c). "Transmission facilities" are defined to include: "power lines; substations; reactive devices; and associated facilities, operated at 60 kilovolts or above, including radial lines operated at or above 60 kilovolts, except the step-up transformers and a protective device associated with the interconnection from a generating station to the transmission network." *Id.* § 25.192(c)(1). Separate sections address interconnection of on-site distribution generation, specifying the type of physical connection, requisite voltage, points of common coupling, etc. *See id.* § 25.211. Indeed, as a condition to obtaining transmission service, a transmission service customer that owns electrical facilities in the ERCOT region shall execute interconnection agreements. *See id.* § 25.195.

The definition of transmission, and therefore the ERCOT grid, necessarily incorporates the delivery of loads from a facility, transmission over distribution facilities, control area services, scheduling resources, and/or the provision of operating reserves. The interconnection devices are encompassed within the ERCOT grid.

■ The PUC rules, in addressing compliance with the ERCOT Protocols, also provide the following:

(a) Initiating Service. Where a transmission service customer uses the trans-

mission facilities in the Electric Reliability Council of Texas (ERCOT), whether its own facilities or those of another transmission service provider (TSP) to serve load or to make sales of energy to a third party, it shall apply for transmission service pursuant to this section, the ERCOT Protocols, and commission-approved tariffs.

(b) Conditions precedent for receiving service.... TSP will provide transmission service to any transmission service customer as that term is defined in § 25.5 of this title (relating to Definitions), provided that: (1) the transmission service customer has complied with the applicable provisions of the ERCOT protocols ...

(c) Procedures for initiating transmission service. A transmission service customer requesting transmission service ... must comply with the ERCOT protocols and commission-approved tariffs.

*Id.* § 25.198(a)-(c). We conclude that any use of the system that involves transfer of power from one facility to another, whether to "serve loads," *or* for sale to a third party, and whether through transmission lines or a transfer at a meter located at the exit of a generating plant to the transmission lines, constitutes use of the transmission portion of the grid such that compliance with the ERCOT protocols is required.

### 3. Compliance with ERCOT Protocols as a Precondition to Enforcement of Contractual Obligations

In response to BP's claims for breach of contract or, alternatively, unjust enrichment, AEP raised the affirmative defense of excuse from performance as a result of commercial impracticability, impossibility of performance, and/or frustration of purpose. The defense is based upon the new legislation which, AEP urges, created new preconditions to acceptance, or "delivery" of power, and BP's failure to comply therewith. AEP contends that BP's failure to comply with the ERCOT Protocols, by registering and identifying a Qualified Scheduling Entity, rendered it impossible or commercially impracticable for AEP to either capture or resell the electricity from BP, such that AEP (1) was excused from any contractual obligations to BP during the period of noncompliance, and (2) did not benefit from the transfer of electricity.

It is undisputed that in excess of 13,000 Mwh of power were sent by BP to AEP during August and September 2001, and that AEP did not pay for this power. AEP argues that because BP failed to comply with the new regulations, BP did not "sell" any power to AEP and AEP's compliance with contractual terms was no longer possible or practicable. Indeed,

> "Where ... a party's performance is made impracticable ... by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged...."

RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981). A governmental regulation or order that makes impracticable the performance of a duty "is an event the non-occurrence of which was made a basic assumption on which the contract was made." RESTATEMENT (SECOND) OF CONTRACTS § 264 (1981).

*Centex Corp. v. Dalton,* 840 S.W.2d 952, 954 (Tex.1992). In support of this argument, AEP provided the trial court with (1) BP's answers and objections to interrogatories; (2) the Resource Entity Agreement between BP and ERCOT, dated October 1, 2001; and (3) the affidavit of Richard Byrne, Manager of Rates for AEP. In the affidavit, Byrne relates the following: (1) beginning July 6, 2001, all

electricity deliveries into the ERCOT system needed to be scheduled by BP through ERCOT; (2) the meters at the interconnection between BP and the ERCOT transmission grid, although owned and maintained by AEP, were registered as ERCOT polled settlement meters and read by ERCOT; (3) only scheduled electricity deliveries are recognized by the system and credited to the respective resource (here, BP); and (4) without registration and scheduling by BP, it was not possible to recognize electricity deliveries as being from a valid sale of power in the wholesale market. Consequently, Byrne urged that (1) until BP completed its registration, it was impossible to give BP credit for energy produced and flowing through AEP's meters; (2) any such power was not eligible for payment; and (3) because that power was not identified as being input into the grid for the benefit of either BP or AEP, AEP was required to purchase its power elsewhere to satisfy its load requirements. Byrne's affidavit states:

> Although electricity may have flowed from the Plaintiff's plant through the ERCOT EPS meters owned by AEP between July 6 and October 1, 2001, such electricity did not accrue to the advantage of AEP as that electricity flowed into the ERCOT transmission grid without being scheduled and balanced with an AEP load; therefore it

could not be credited to any entity. Only the ERCOT grid, as a whole, benefitted from the electricity produced by the Green Lake Plant.

BP's reply to AEP's motion for summary judgment referenced the affidavit of Bernardo Hernandez which BP had tendered [18] with its motion for summary judgment. Hernandez, Director of Energy Management Services for BP, in this regard asserts only that excess electricity was generated at the Green Lake Plant, and it was delivered through the AEP meters according to the contract with AEP. Hernandez also itemizes the Mwh of electricity passing through the meters in August and September 2001.

On appeal, BP argues that AEP failed to establish its affirmative defense because the regulations did not require unbundling and AEP (CP & L) did not unbundle prior to the deadline of January 1, 2002. BP does not address other effective dates of the ERCOT Protocols. BP instead argues that a Federal Energy Regulatory Commission ("F.E.R.C.") order of May 17, 2001, recognized by the Texas PUC in its order of June 20, 2002, required electric utilities to continue to meet their contractual obligations to purchase power from qualifying facilities notwithstanding deregulation of the Texas electricity market. The federal order, *Cogen Lyondell, Inc.*,[19]

---

18. Although AEP raised objections that some statements in the Hernandez affidavit were conclusory only, no rulings on those objections are included in the trial court order disposing of the motions for summary judgment.

19. The Order is formally entitled "Order Granting Declaratory Order and Denying Waiver of Regulations Implementing PURPA." "PURPA" is the Public Utility Regulatory Policies Act of 1978, Pub. Law No. 95–618, 92 Stat. 3117 (codified as amended in scattered sections 815, 816, 843–43 of title 16

of the United States Code), and gives Qualifying Facilities ("QFs") such as the Green Lake Plant the right to sell (put) electricity to electric utilities at "avoided costs." The F.E.R.C. order denied the QFs the waiver they sought, holding instead that a state commission must "maintain its obligation to implement PURPA after unbundling and the commencement of competition." *See In re Arrangements Between Qualifying Facilities and Electric Utilities*, 2002 WL 31163863, 2002 Tex. PUC LEXIS 26, at *3 (June 20, 2002).

95 F.E.R.C. ¶ 61,243 at 61,836 (May 17, 2001), provides:

> The Texas QFs ["Qualifying Facilities"] ask the Commission to declare that under PURPA the restructured utility holding company systems in Texas continue to satisfy the definition of electric utility and continue to have an obligation to make purchases from the Texas QFs.... We will therefore grant the Texas QF's request for declaratory order, to the extent that they are requesting the Commission to state that any company which meets the PURPA definition of electric utility following restructuring has a purchase obligation as set forth in 18 C.F.R. § 292.303 (2000).

*Id.*[20] The PUC Order, enacted subsequent to the action taken by the F.E.R.C., states as follows:

> The commission finds that it has the obligation to implement PURPA and, thus will do so through this rulemaking rather than allowing self-implementation. The commission's instruction at its December 19, 2001 open meeting that the ERCOT electric utilities, as defined by PURPA, continue fulfilling their mandatory purchase obligations at market prices until this proposed rule becomes finalized was meant to be strictly transitional.

*See In re Arrangements Between Qualifying Facilities and Electric Utilities,* 2002 WL 31163863, 2002 Tex. PUC LEXIS 26, at *12 (June 20, 2002). The Order goes on to address calculation of avoided cost rates, and clarifies the commission's agreement with Texas QFs that "a two-step process whereby the commission adopts a transitional avoided cost pricing methodology that relies on a reasonable proxy for prices until a liquid, real-time market develops is reasonable and preferable." *Id.*,

2002 WL 31163863, 2002 Tex. PUC LEXIS 26, at *13. Any ultimate development of a liquid spot market would be facilitated by "relaxation or elimination of ERCOT's balanced schedule requirement." *Id.* Therefore, the scheduling requirement is part of the transitional period from a fully regulated to a real-time competitive market. The scheduling requirement was clearly in effect during the period of September–October 2001 and was not obviated by the Order. Further, the Order contemplates a direct delivery system, such as that between the Green Lake Plant and the AEP/ERCOT meters, reiterating that "delivery from the QF may be directly connected via the affiliated TDU" to the transmission and/or distribution grid. We consider this to mean the interconnection at the meter was, in effect, to the ERCOT grid. Finally, nothing in any of the cited orders sanctions non-compliance with ERCOT regulations.

■ "A promissor may be excused from performance of a contract by intervening changes in the law." *Int'l Bank of Commerce of Laredo v. Union Nat'l Bank of Laredo,* 653 S.W.2d 539, 550 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.); *see also Tractebel Energy Mktg., Inc. v. E.I. DuPont de Nemours & Co.,* 118 S.W.3d 60, 64–65 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (noting that in regard to a contract for service, "a change in the law that makes performance illegal also renders it impracticable.").

■ Here, we have the violation of a statute that mandated compliance with a scheduling requirement no later than July 6, 2001. Enactment of the scheduling requirement did not undermine or impair satisfaction of PURPA's objectives; instead, it simply added a state requirement

---

**20.** This obligation to accept excess power relates to obligations under PURPA and is not co-incident with the contractual obligations in issue here.

to register and designate a Qualified Scheduling entity. In addition, AEP included in its summary judgment evidence the affidavit of Richard Byrne, Manager of Rates for AEP. As noted above, Byrne asserted that, absent registration, it was not possible to either recognize, identify, or credit unscheduled power for the benefit of either BP or AEP.

We determine that BP was required to register with ERCOT for any transmission of power onto the ERCOT grid, and that the transfer at the AEP meters was "onto the ERCOT grid." We further determine that AEP's affidavit of Byrne directly asserts that absent that registration, power contributions could not be attributed to the benefit of either BP or AEP. The affidavit was properly submitted as part of AEP's summary judgment evidence and speaks directly to implementation of the ERCOT grid and its operations.[21]

Byrne's affidavit could have been controverted by BP. It was not. The affidavit of Hernandez, tendered by BP, did not address the relationship to or operations of the ERCOT market or grid. Uncontroverted evidence of an interested witness or an expert witness is sufficient to establish a matter conclusively if the evidence is clear, positive, direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. TEX.R. CIV. P. 166a(c); *City of Keller*, 168 S.W.3d at 820; *Casso v. Brand*, 776 S.W.2d 551, 557–58 (Tex.1989).

We conclude the trial court (1) did not err in finding that AEP conclusively established its affirmative defense of commer-cial impracticability, impossibility of performance, and/or frustration of purpose; and (2) did not err in granting summary judgment in favor of AEP as to power transfers made during August and September 2001. We overrule BP's issues one, two, three, and five, as they relate to the August and September 2001 power transfers.

### B. The September–December 2001 Sales

■ BP, in its fourth issue, addresses the time frame of September 26 to December 31, 2001, and BP's claim for the difference between the amount it received and what it should have received for the sale of its power. After September 25, 2001, BP sold its excess power to third parties, after AEP had failed to pay for the August and September deliveries. AEP responded with the affirmative defense of failure of consideration, following upon its argument that there was no breach because AEP was excused from performance under the contract as to the August and September deliveries because of commercial impracticability, impossibility of performance, and/or frustration of purpose. The question arising with respect to the later deliveries is, in essence, whether, if there was a breach by AEP, BP was justified in working to mitigate its damages and is therefore entitled to recover the difference in monies recovered, or whether, if there was no breach, AEP indicated it would refuse to take delivery of excess power after September 25, 2001, such that BP was justi-

---

21. "The RESTATEMENT says that the question of impracticability 'is generally considered to be one of law rather than fact.' " *Tractebel Energy Mktg., Inc. v. E.I. DuPont de Nemours & Co.*, 118 S.W.3d 60, 65–66 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (citing RESTATEMENT (SECOND) OF CONTRACTS, ch. 11, introductory note, p. 310 (1981)). However, "the very case cited by the RESTATEMENT in support of that position suggests it is a mixed question of law and fact." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS, ch. 11, introductory note, p. 310 (1981); *Mitchell v. Ceazan Tires, Ltd.*, 25 Cal.2d 45, 153 P.2d 53, 54 (1944) ("[impossibility] is a conclusion of law drawn by the court from the facts of a given case.")).

fied in seeking its alternative markets.[22] In issue six, BP contends that, in the alternative, issues remain that preclude summary judgment with respect to the September 26 through December 31, 2001, deliveries.[23]

Summary judgment evidence tendered by BP addresses the amount of scheduled power deliveries into the ERCOT grid between September 26 and December 31, the monies BP received for the sale of that power to third parties, and the monies BP would have received had AEP purchased the power pursuant to the contracts. The Hernandez affidavit relates that "because it was obvious that CP & L[AEP] did not intend to honor its commitments, BP was forced to mitigate its damages by selling the excess power from the Green Lake plant to other purchasers at prices below what was due under the contract with CP & L[AEP]." BP requests the difference of $118,541.73 as damages. Summary judgment evidence tendered by AEP, including the affidavit of Byrne, reflects the following:

> During the period of September 26, 2001, through December 31, 2001, 19,708 Mwh of electricity from the Green Lake Plant passed through the ERCOT EPS metering maintained by AEP at the Green Lake Plant.... After October 1, 2001, such electricity could have been sold to AEP, and AEP would have paid for such power pursuant to the contracts. However, the Plaintiff chose to sell its power to a third party who was scheduled as receiving such power in the ERCOT market.

There is no other evidence relating to either an attempt to sell the power to AEP or AEP's intent had it been approached about the sales. Given our conclusion that AEP was excused from performance under the contracts during August and September 2001, BP bore the burden to show that it was excused and entitled to mitigate its damages because AEP refused, or indicated its intent to refuse, to comply with the contracts between September 26 and December 31, 2001. As noted above, where affidavit testimony is clear, positive, direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted but was not, it is sufficient to establish a matter conclusively. TEX. R. CIV. P. 166a(c); *City of Keller*, 168 S.W.3d at 820; *Casso*, 776 S.W.2d at 557–58. We conclude the trial court did not err in granting summary judgment in favor of AEP, where the only evidence before the trial court indicates AEP's willingness to have complied with the contracts subsequent to BP's registration, had it been given the opportunity. We overrule BP's fourth issue and its fifth issue as it relates to the September 26 through December 31, 2001, transfers of electricity.

## V. Conclusion

We affirm the judgment of the trial court in its entirety.

**22.** *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 165 (Tex.1982) ("It is well established that the plaintiff in a breach of contract action can only recover 'such damages as he could not have prevented with reasonable exertions and expense.' ")

(citing *Walker v. Salt Flat Water Co.,* 128 Tex. 140, 96 S.W.2d 231, 232 (Tex.1936)).

**23.** Issue five also applies to these deliveries, as it contends the trial court erred in granting AEP's motion for summary judgment.