TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00417-CV






Public Utility Commission of Texas; Luminant Energy Company LLC f/k/a TXU Portfolio
Management Company LP; Luminant Generation Company LLC f/k/a TXU Generation
Company LP; City of Austin d/b/a Austin Energy; City of San Antonio d/b/a/ CPS Energy,
Reliant Energy Power Supply, LLC; and Lower Colorado River Authority, Appellants


v.


Constellation Energy Commodities Group, Inc., Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. D-1-GN-08-001213, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING





O P I N I O N


 On November 14, 2006, Constellation Energy Commodities Group, Inc.
("Constellation") filed a complaint with the Public Utility Commission of Texas ("the Commission")
against the Electric Reliability Council of Texas ("ERCOT") alleging that two of ERCOT's
protocols (1) were contradictory and inconsistent and that ERCOT had improperly assessed charges
against Constellation from April 10, 2006, to September 27, 2006, using the inconsistent protocols. 
Luminant Energy Company LLC f/k/a TXU Portfolio Management Company LP and Luminant
Generation Company LLC f/k/a TXU Generation Company LP ("Luminant"), as well as City of
Austin d/b/a Austin Energy, City of San Antonio d/b/a CPS Energy, Reliant Energy Power Supply,
LLC, and Lower Colorado River Authority ("Joint Intervenors") intervened in the proceeding
in support of ERCOT. After the Commission referred the case to the State Office of Administrative
Hearings ("SOAH"), the administrative law judge ("ALJ") agreed with Constellation that the
protocols in question were inconsistent and recommended the Commission require ERCOT to
resettle the charges. The Commission rejected the ALJ's recommendation, determining instead
that ERCOT had correctly settled the capacity insufficiency charges in accordance with the protocols
then in effect. Constellation filed suit for judicial review in district court, which reversed the
Commission's determination that ERCOT had correctly assessed the charges against Constellation.
This appeal followed.

 Luminant, the Joint Intervenors, and the Commission argue the district court erred
by failing to defer to the Commission's construction of the protocols and its conclusion that ERCOT
properly assessed charges. Luminant and the Joint Intervenors further contend Constellation's case
is an impermissible collateral attack on a final Commission order. As a conditional cross-point,
Constellation asserts ERCOT cannot assess an under-scheduling charge that is over and above its
actual procurement costs.

 For the reasons set forth below, we reverse the trial court's judgment and render
judgment affirming the Commission's final order.


FACTUAL AND PROCEDURAL BACKGROUND


 Since the implementation of retail choice in Texas in 2002, retail providers
of electricity, in general, meet their customers' demand by entering into bilateral contracts with
generation owners and power marketers. ERCOT is the independent organization the Commission
has certified as responsible for, among other things, ensuring the reliability and adequacy of the
electric grid, as well as establishing, scheduling, and overseeing transaction settlement procedures.
See Tex. Util. Code Ann. § 39.151 (West 2007).

 Under ERCOT rules ("protocols") in effect on the disputed trade days, a qualified
scheduling entity ("QSE") on the retailer's behalf engaged in bilateral contracts with generation
owners and power marketers and submitted a schedule to ERCOT demonstrating that its expected
demand was equal to the amount of generation it had procured to meet that demand. When the
QSE's scheduled demand exceeded its scheduled supply or when its actual demand exceeded the
amount of generation it had procured, the QSE was "under scheduled." QSEs under scheduled for
several reasons: inaccurate load forecasting, a change in real-time conditions, or a strategic decision
to rely upon ERCOT as a Resource to cover a portion of a QSE's Load. (2)

 Consumption rarely matches generation exactly, so ERCOT's protocols authorized
it to procure "ancillary service" to address actual or anticipated imbalances. (3) Ancillary services
consist of various forms of "capacity"--the commitment of generation resources to be available
for production in a given operating period--and "energy"--the real-time provision of electricity. 
When a QSE under scheduled, ERCOT obtained ancillary services to address anticipated
generation shortfalls.

 QSEs were permitted to schedule purchases of power from generators located
far from the demand or Load scheduled by the QSE. When too many of those transactions occurred,
transmission routes between major consumption centers could become "congested." (4) The most
commonly congested transmission routes effectively determined geographic "zones," usually
identified by ERCOT as the North, West, South, and Houston zones, which required separate
balancing by ERCOT. Congestion also prevented some inter-zonal transactions from occurring,
which obligated ERCOT to procure expensive power in the zone where the load was scheduled to
ensure that sufficient electricity existed to meet demand. Thus, when a QSE submitted a schedule
that was balanced on a system-wide basis but unbalanced within one or more zones, ERCOT still
might have incurred costs for ancillary services to resolve that intra-zonal capacity imbalance.

 One of the ancillary services ERCOT used to resolve projected imbalances was a
form of capacity called "replacement reserve service" ("RPRS"), which required an owner of an off-line generation resource to make that unit available for ERCOT's use, if necessary, during a
particular hour of market operation. ERCOT procured RPRS through a day-ahead auction for each
operating hour, and winning bidders were paid the market-clearing price for electricity.

 Different ERCOT protocols controlled the procurement, compensation, and
settlement of RPRS. Section 6.6, entitled "Selection Methodology," governed ERCOT's acquisition
of various ancillary services. See ERCOT Zonal Protocols § 6.6 (March 2006 Protocols Update 2,
March 21, 2006), available at http://www.ercot.com/mktrules/protocols/library/2006. (5)
Section 6.6.3.2.1, "Specific Procurement Process Requirements for [RPRS] in the Adjustment
Period" (hereinafter the "RPRS procurement protocol"), detailed the circumstances and
process under which ERCOT obtained RPRS for each operating hour. See id. § 6.6.3.2.1. That
protocol required ERCOT to procure RPRS to rectify capacity insufficiency, zonal transmission
congestion, and local transmission congestion.

 Because it costs a generator money to start up a unit and keep it running at the
minimum level necessary to ensure that power could be delivered if customer load demanded
more energy, ERCOT's procurement of RPRS capacity resulted in costs, regardless of whether any
energy from the committed Resource was actually sold on the market. Even though a QSE submitted
a schedule that was balanced on a system-wide basis, ERCOT may also have incurred costs if
the schedule was imbalanced within one or more zones. Those costs occurred because, to balance
a particular zone, ERCOT may have procured power from a generator within that zone that was more
expensive than if a generator from outside the zone had been utilized. If ERCOT procured RPRS,
it made a payment to the QSE providing the service according to the methods and formulas specified
in section 6.8, "Compensation for Services Provided." See id. § 6.8.

 Section 6.9, "Settlement for ERCOT-Provided Ancillary Services," contained the
mathematical formulas ERCOT utilized to calculate RPRS settlement, that is, the charges ERCOT
levied against the QSEs for procuring RPRS. See id. § 6.9. Protocol 6.9.2.1, entitled "Settlement
for RPRS," set forth formulas for two different charges related to RPRS: an under-scheduling
charge and an uplift charge. See id. §§ 6.9.2.1, 6.9.2.1.1, 6.9.2.1.2. Before being amended in
October 2006, the formula set forth in section 6.9.2.1.1, entitled "Replacement Reserve Under-Scheduled Capacity" (hereinafter, the "RPRS under-scheduled settlement protocol"), required a
direct assessment of charges to a QSE that scheduled short in any zone if ERCOT actually
procured RPRS. See id. § 6.9.2.1.1. Although the formula sometimes resulted in an under-scheduling charge that was less than ERCOT's total RPRS procurement costs, often the charge was
greater than the cost that ERCOT had incurred in procuring RPRS to remedy the projected capacity
insufficiency. See id.

 The second part of the RPRS settlement protocol, section 6.9.2.1.2 (entitled
"Replacement Reserve Uplift Charge"), provided the formula that "uplifted" (or "socialized") any
remaining RPRS costs (or any over-recovered balance) among all QSEs. (6) See id. § 6.9.2.1.2. The
protocol calculated the uplift charge by (1) summing the costs of RPRS for local congestion, zonal
congestion, and capacity insufficiency and then (2) subtracting out the payments received through
the under-scheduling charge and the zonal congestion charge. See id. The remaining cost balance,
whether positive or negative, was uplifted to all QSEs according to load-ratio share. The uplift
charge formula provided that, whenever the total amount of under-scheduling charges in
section 6.9.2.1.1 was less than ERCOT's costs for providing RPRS, the remaining costs were
socialized among QSEs by load-ratio share. See id. Likewise, whenever the total amount of under-scheduling charges was greater than ERCOT's costs, the excess recovery was distributed among the
QSEs by load-ratio share. See id. 

 ERCOT assessed under-scheduling charges of approximately $3.8 million against
Constellation for the trade days in question, in accordance with the formula set forth in
section 6.9.2.1.1. See id. § 6.9.2.1.1. Constellation disputed the charges. After ERCOT denied
Constellation's complaint, Constellation appealed to the Commission, alleging that ERCOT had
erroneously calculated the under-scheduling charges based on Constellation's zonal-capacity
insufficiency instead of its system-wide shortfall. Constellation conceded that section 6.9.2.1.1
required calculation of under-scheduling charges on a zonal basis, but argued the RPRS procurement
protocol (section 6.6.3.2.1) indicated that QSEs were intended to incur RPRS costs for capacity
insufficiency only if they were system-wide, not merely in a zone. See §§ 6.6.3.2.1, 6.9.2.1.1.
Constellation proposed that, in order to calculate the "correct" charges, the Commission should
ignore the RPRS under-scheduled settlement protocol (section 6.9.2.1.1) and uplift the cost of
capacity insufficiency to the entire market on a load-ratio share basis as set forth in
section 6.6.3.2.1(9) (the "uplift solution"). See id.

 After the Commission referred the matter to SOAH, the ALJ granted
summary disposition in Constellation's favor, agreeing that the under-scheduling charges should
have been calculated using the uplift solution. The ALJ found that the RPRS procurement protocol
(section 6.6.3.2.1) and the RPRS under-scheduled settlement protocol (section 6.9.2.1.1) were
"inconsistent and contradictory" and that the RPRS procurement protocol should have been applied
strictly as written, that is, the cost of allocation uplifted to all QSEs based on load-ratio share. The
ALJ noted that, although ERCOT had made no mathematical errors in applying the formula set forth
in the RPRS under-scheduled settlement protocol, "that formula was incorrectly written to charge
RPRS capacity insufficiency costs on a zonal basis rather than on a Load Share [basis]" as the
RPRS procurement protocol required. The ALJ recommended the Commission order ERCOT to
resettle the contested trade days by uplifting on a load-ratio share basis the RPRS cost for
capacity inadequacy as "all other costs" [sic] in subsection (9) of the RPRS procurement protocol,
section 6.6.3.2.1. See id. § 6.6.3.2.1(9). Section 6.6.3.2.1(9) read as follows:


 If all of the cost of RPRS is not allocated by one of the above methods, then the
allocation will be uplifted to all QSEs based on the Load Ratio Share for the relevant
period. If ERCOT collects more RPRS costs in this manner than are necessary, the
excess funds collected by ERCOT will be credited to all QSEs based on the Load
Ratio Share for the relevant period.



Id. § 6.6.3.2.1(9).

 The Commission disagreed with the ALJ's analysis. It concluded the protocols
were harmonious and not in conflict. It further stated that "ERCOT correctly settled the capacity
insufficiency charges for the disputed operating dates in accordance with the Protocols then in
effect and that no resettlement should occur." The Commission also determined that "ERCOT
correctly applied the formula as written at that time and that a protocol revision request (PRR) was
later utilized to modify the protocol to avoid the consequences of applying the zonal factor as the
formula previously required."

 Constellation sought judicial review. The district court found that the RPRS under-scheduled settlement protocol (section 6.9.2.1.1) and the RPRS procurement protocol
(section 6.6.3.2.1) were in "irreconcilable conflict" and that the RPRS procurement protocol was the
"special or specific Protocol that must be given controlling effect in this case." See id. §§ 6.6.3.2.1,
6.9.2.1.1. The court reversed the Commission's order, concluding that, because ERCOT did not
give controlling effect to the RPRS procurement protocol but instead calculated Constellation's
RPRS charges using the RPRS under-scheduled settlement protocol, ERCOT failed to correctly
settle the RPRS charges. This appeal followed.


DISCUSSION


Commission's Interpretation of ERCOT Protocols

 ERCOT protocols are rules that provide the framework for the administration of
the Texas electricity market. BP Chemicals, Inc. v. AEP Tex. Cent. Co., 198 S.W.3d 449, 452
(Tex. App.--Corpus Christi 2006, no pet.). ERCOT protocols, however, are subject to Commission
oversight and review. Tex. Util. Code Ann. § 39.151(d); see also id. (g) (Commission must
approve protocols and protocols must reflect Commission's input). An agency's interpretation of
a rule becomes part of the rule itself and represents the view of the regulatory body that
must administer it. H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., 36 S.W.3d 597, 604
(Tex. App.--Austin 2000, pet. denied).

 Statutory construction presents a question of law that we review de novo. State
v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). Because they have the force and effect of statutes,
we construe administrative rules in the same manner as statutes. Rodriguez v. Service Lloyds Ins.
Co., 997 S.W.2d 248, 254 (Tex. 1999). "Unless the rule is ambiguous, we follow the rule's clear
language." Shumake, 199 S.W.3d at 284.

 We also must give "serious consideration" to the construction of a statute by the
administrative agency charged with its enforcement. Railroad Comm'n v. Texas Citizens for a Safe
Future & Clean Water, 336 S.W.3d 619, 624 (Tex. 2011). In our "serious consideration inquiry,"
we will generally uphold an agency's interpretation of its own rules unless that interpretation is
plainly erroneous or inconsistent with the text of the rule. See id. at 625.

 The supreme court has observed that deference to an agency's interpretation is
"tempered" by several considerations. See id. First, deference "applies to formal opinions adopted
after formal proceedings, not isolated comments during a hearing or opinions [in a brief]." Id.
(quoting Feiss v. State Farm Lloyds, 202 S.W.3d 744, 747 (Tex. 2006). Second, the language at
issue must be ambiguous. Feiss, 202 S.W.3d at 747. Third, the agency's construction must be
reasonable. Id. at 747-48.

 When a statutory scheme is subject to multiple understandings, that is, ambiguous,
we must uphold the enforcing agency's construction of its statutory scheme if is reasonable and
in harmony with the statute. See Texan Citizens, 336 S.W.3d at 629. This deference is particularly
important in a complex regulatory scheme like the Public Utility Regulatory Act. See id. at 629-30.

 Accordingly, we must determine whether the Commission's interpretation of the
ERCOT protocols in question is plainly erroneous or inconsistent with the text of the protocols
and defer to the Commission's construction of its regulatory scheme if is reasonable and in harmony
with the statute.

 The Commission, the Joint Intervenors, and Luminant (collectively, "appellants")
assert the district court erred in rejecting the Commission's conclusion that ERCOT properly
assessed RPRS under-scheduling charges to Constellation in accordance with the under-scheduled
capacity formula set forth in section 6.9.2.1.1, the RPRS under-scheduled settlement protocol. See
ERCOT Zonal Protocols § 6.9.2.1.1. Appellants contend the district court failed to give deference
to the Commission's construction of the RPRS procurement protocol (section 6.6.3.2.1) and
the RPRS under-scheduled settlement protocol, as well as the Commission's conclusion that the
two protocols were not in conflict but were harmonious. See id. §§ 6.6.3.2.1, 6.9.2.1.1.

 Contrary to Constellation's assertion that ERCOT erroneously calculated under-scheduling charges based on Constellation's zonal-capacity insufficiency instead of its system-wide
shortfall and that the RPRS procurement protocol (section 6.6.3.2.1) indicated that QSEs were
intended to incur RPRS costs for capacity insufficiency only if they were system-wide, Luminant
argues the version of the RPRS under-scheduled settlement protocol in effect during the relevant
market days required measurement of under-scheduling charges on a zonal, not on a system-wide,
basis. See id. It asserts that no other ERCOT protocol addressed the imposition of charges to a QSE
that under scheduled, either in a zone or otherwise.

 Luminant contends that, contrary to what the district court found, the RPRS
procurement protocol said nothing about the consequences to a QSE for under scheduling capacity
in a zone. See id. § 6.6.3.2.1. The Joint Intervenors likewise argue that section 6.6.3.2.1 neither
prohibited ERCOT from imposing under-scheduling charges, nor did that protocol even address the
obligations of capacity-short QSEs. See id. Rather, Luminant contends, section 6.6.3.2.1 merely
specified when and how ERCOT had to procure RPRS in the first place and summarized ERCOT's
duty to uplift (or "socialize") any under- or over-collected RPRS costs. See id. Luminant argues
that, because the under-scheduled capacity formula in section 6.9.2.1.1 was the only provision that
specified the economic consequences of under scheduling capacity in a zone and that provision was
clear and unambiguous, the district court erred in looking beyond the RPRS under-scheduled
settlement protocol. See id. § 6.9.2.1.1.

 The Commission also argues that the protocol that most specifically addressed
the issue of the appropriate means of RPRS settlement was section 6.9.2.1.1. See id. Only the
RPRS under-scheduled settlement protocol included the precise details of how RPRS settlement was
to be carried out. Indeed, notes the Commission, section 6.9.2.1.1 contained three pages of equations
and variables determining the method of settlement, compared with one sentence in subsection 9 in
the RPRS procurement protocol. (7) See id. §§ 6.6.3.2.1(9), 6.9.2.1.1.

 In response, Constellation asserts that the formula in section 6.9.2.1.1 conflicted with
the RPRS procurement protocol. Constellation contends that, because subsection (9) of the RPRS
procurement protocol (section 6.6.3.2.1) required an uplift of RPRS insufficiency costs on a load-ratio share basis, whereas the RPRS under-scheduled charge formula in section 6.9.2.1.1 directly
assigned a charge to QSEs under-scheduled in any zone, the two protocols conflicted. See id.

 However, the Joint Intervenors argue no inconsistency existed between
ERCOT uplifting remaining RPRS costs on a load-ratio share basis and imposing a charge on
capacity-short QSEs that had benefitted from under scheduling. (8) They contend that, because a
distinction exists between "charges" and "costs," the district court failed to understand that the
RPRS under-scheduled settlement protocol and the RPRS procurement protocol harmoniously
coexisted. The Joint Intervenors assert the RPRS settlement protocol, section 6.9.2.1, had two parts:
section 6.9.2.1.1, which described and calculated under-scheduled capacity charges to capacity-short
QSEs, charges not intended to match ERCOT's exact procurement costs; and section 6.9.2.1.2,
which contained the uplift formula through which ERCOT's RPRS procurement costs and under-scheduled capacity charges were netted. See id. §§ 6.9.2.1, 6.9.2.1.1, 6.9.2.1.2.

 Subpart 10 of section 6.3.1, entitled "ERCOT Responsibilities," read, in pertinent
part, as follows: "ERCOT will not profit financially from the market." Id. § 6.3.1(10). Because that
protocol required ERCOT to be a revenue-neutral entity, the Joint Intervenors point out that all costs
and revenues had to be returned to market participants. They assert the formula in section 6.9.2.1.2
incorporated the RPRS procurement costs that ERCOT incurred and the RPRS under-scheduling
charges that ERCOT collected. See id. § 6.9.2.1.2. The Joint Intervenors contend that, pursuant
to the formula in section 6.9.2.1.2, ERCOT netted the cost of RPRS procurement with any
RPRS under-scheduling charges collected, and the uplift charge to each QSE was calculated based
on its own load-ratio share. See id. Thus, the uplift charge achieved the socialized distribution of
excess costs or receipts referenced in subsection (9) of section 6.6.3.2.1, the RPRS procurement
protocol. See id. §§ 6.6.3.2.1, 6.9.2.1.2.

 We hold that the Commission's interpretation of section 6.9.2.1.1, the RPRS under-scheduled settlement protocol, was consistent with the protocol's plain language. See id. § 6.9.2.1.1.
Section 6.9.2.1.1 specifically authorized ERCOT to impose under-scheduling charges on a QSE that
scheduled short in any zone, and the Commission's order accurately concluded that ERCOT settled
the capacity insufficiency charges assessed to Constellation in accordance with the text and formula
set forth in section 6.9.2.1.1. See id.

 We further hold the district court erred in finding that the RPRS procurement protocol
and the RPRS under-scheduled settlement protocol were in irreconcilable conflict. See id.
§§ 6.6.3.2.1, 6.9.2.1.1. As Luminant pointed out, the under-scheduling charge was based, in part,
on the market clearing price for capacity ("MCPC") for insufficiency defined in subsection (6)(a)
of the RPRS procurement protocol, which read as follows:


 The marginal cost (Shadow Price of the power balance constraint) to
solve system insufficiency defines MCPC for insufficiency.



Id. § 6.6.3.2.1(6)(a); see also § 2.1 (definition of "market clearing price for capacity"). The
Commission in its order noted that "subsection (6) of Protocol § 6.6.3.2.1 [the RPRS procurement
protocol] speaks to capacity insufficiencies and provides a factor for insufficiency that is included
in the formula for calculating charges to under-scheduled [QSEs] on a zonal basis in Protocol
[section 6.9.2.1.1]." See id. §§ 6.6.3.2.1, 6.9.2.1.1. The Commission thus harmonized the RPRS
procurement protocol and the formula in the RPRS under-scheduled settlement protocol and
concluded the protocols did not conflict. See id. Finding that the Commission's construction of this
regulatory scheme is reasonable and in harmony with the statute, we hold the district court erred in
failing to defer to the Commission's interpretation.

 Finding that the Commission's order accurately concluded that ERCOT settled
the capacity insufficiency charges assessed to Constellation in accordance with the text and formula
set forth in section 6.9.2.1.1, the RPRS under-scheduled settlement protocol, and that the
RPRS procurement protocol and the RPRS under-scheduled settlement protocol did not conflict, we
sustain appellants' first issue.

 Having sustained appellants' first issue, we need not reach Luminant's and the
Joint Intervenors' second issue.


Constellation's Cross-Point

 The district court concluded that "[the Commission] and ERCOT did not act outside
the scope of their statutory authority by overcharging for RPRS procurement." As a conditional
cross-point, Constellation asserts that, if the court's conclusion is interpreted to mean that ERCOT
had the authority to intentionally impose a charge over and above ERCOT's actual procurement
costs, that conclusion is in error. Constellation argues ERCOT only had authority to charge
QSEs for ERCOT's actual costs of procuring RPRS to resolve capacity insufficiency. It contends
that the formula in the RPRS under-scheduled settlement protocol "cannot, as a matter of law, be
interpreted to allow ERCOT to assess a charge over and above its actual costs." See id. § 6.9.2.1.1.
We disagree.

 As the Commission has noted, no statute, rule, or protocol demanded that ERCOT's
under-scheduling charges correlate exactly with its costs in procuring RPRS. Although it often
assessed an under-scheduling charge that was greater than its procurement costs, ERCOT retained
no cost excess from the under-scheduling charge. Rather, as required by section 6.9.2.1.2, ERCOT
uplifted any excess to the market, thus remaining revenue neutral as required by section 6.3.1(10).
See id. §§ 6.3.1(10), 6.9.2.1.2. Constellation's cross-point is overruled.


CONCLUSION


 Having sustained appellants' first issue, we reverse the district court's judgment and
render judgment affirming the Commission's order that determined ERCOT had correctly assessed
under-scheduling charges against Constellation for the period April 10, 2006, to September 27, 2006.


 ___________________________________________

 David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Rendered

Filed: September 28, 2011
1. ERCOT protocols are rules that provide the framework for the administration of the
Texas electricity market. BP Chemicals, Inc. v. AEP Tex. Cent. Co., 198 S.W.3d 449, 452
(Tex. App.--Corpus Christi 2006, no pet.).
2. "Resource" is defined as "facilities capable of providing electrical energy or Load capable
of reducing, or increasing the need for electrical energy or providing Ancillary Services to the
ERCOT System, as described in Section 6, Ancillary Services. This includes Generation Resources
and Loads acting as Resources." ERCOT Zonal Protocols § 2.1 (March 1, 2006), available at
http://www.ercot.com/mktrules/protocols/library/2006. "Load" is "the amount of electric power
delivered at any specified point or points on a system." Id.
3. "Ancillary services" are services "necessary to support the transmission of energy from
Resources to Loads while maintaining reliable operation of transmission provider's transmission
systems in accordance with Good Utility Practice." Id.
4. "Congestion" is defined as "the situation that exists when requests for power transfers
across a Transmission Facility element or set of elements, when netted, exceed the transfer capability
of such elements." Id. Congestion can be either local (within a zone) or zonal (between two or
more zones).
5. All subsequent citations to section 6 of ERCOT Zonal Protocols, entitled "Ancillary
Services," were effective March 21, 2006. 
6. "Uplift" is defined as "the process of allocating costs to QSEs based on Loads and exports
within the ERCOT Region." ERCOT Zonal Protocols § 2.1 (March 1, 2006). 
7. "If all of the cost of RPRS is not allocated by one of the above methods, then the allocation
will be uplifted to all QSEs based on the Load Ratio Share for the relevant period." ERCOT Zonal
Protocols § 6.6.3.2.1(9).
8. A QSE could decide if the economic benefit of likely achieving a lower price in the real-time market made under-scheduling worth its known risks, that is, under-scheduled charges. QSEs
knew that, if other QSEs scheduled "long," that is, scheduled capacity in excess of what was
required to meet their delivery obligations, ERCOT might not need to procure RPRS. And if
ERCOT did not procure RPRS, then no under-scheduling charges would be assessed against those
QSEs that intentionally scheduled less capacity than needed to meet their delivery obligations.