**Louis M. HOWARD, Appellant,**

v.

**CITY OF KERRVILLE and The Upper Guadalupe River Authority, Appellees.**

**No. 04–01–00063–CV.**

Court of Appeals of Texas, San Antonio.

March 6, 2002.

Daniel M. Anderson, Barron, Adler & Anderson, L.L.P., Austin, for appellant.

Karen L. Watkins, McGinnis Lochridge & Kilgore, L.L.P., Austin, William M. McKamie, Deborah L. Leach, Fletcher & Springer, L.L.P., San Antonio, Richard C. Mosty, Keith, Weber & Mosty, P.L.L.C., Kerrville, for appellees.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice,[1] PAUL W. GREEN, Justice.

Opinion by: PAUL W. GREEN, Justice.

Appellant Louis M. Howard brought suit against the City of Kerrville ("the City") and the Upper Guadalupe River Authority ("the UGRA") claiming that the dam they constructed on the Guadalupe River and the concomitant city regulations have resulted in a taking of his river front property. The trial court granted the City's and the UGRA's motions for summary judgment, and it awarded them attorney's fees. Howard now appeals the trial court's denial of his takings claims and the award of attorney's fees. After reviewing the record, we affirm the trial court's judgment in part, and reverse it in part.

### STATEMENT OF FACTS

In 1977, the City of Kerrville entered into a water supply contract with the UGRA to build a dam on the Guadalupe River. Before constructing the dam, the UGRA acquired a permanent flood easement across 6.03 acres of land owned by Howard's predecessor in title. The easement provided that the anticipated flood plain level for the 100 year flood plain was approximately 1640.5 feet mean sea level (m.s.l.) plus one foot.[2] Therefore, Howard's predecessors in title were required to fill their property to 1641.5 m.s.l (the base flood elevation plus one foot).

In 1978, the City passed Ordinance No. 78–9, which adopted the first flood plain maps prepared by the Federal Emergency Management Agency ("FEMA"). According to the City's interpretation, the FEMA map placed all but a narrow strip of the property at issue in the 100 year flood way.[3] Furthermore, under that ordinance

---

1. Justice Rickhoff did not participate in this judgment.

2. By definition, a 100 year flood event is one that has a one percent chance of occurring during any given calendar year.

3. Ordinance No. 78–9 defines a floodway as a "channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot." According to the City and the UGRA, the FEMA maps showed

no development was permitted in the flood way without a permit from the City's flood plain administrator.

In 1982, FEMA published findings of fact on the flood way and the base flood elevations of the Guadalupe River. These findings were predicated on a peak flood of 155,000 cubic feet per second ("c.f.s.") which has a probability of occurring every 100 years. These 1982 findings were adopted in a flood insurance rate map ("FIRM"). The 1982 FIRM also established that the base flood elevation for Howard's property was at an approximate average level of 1640.5 feet.

In December of 1984, the original dam built was destroyed by a flood. In January 1985, Espey–Huston & Associates ("Espey–Huston"), an engineering and hydrology firm, assessed the damage, and eventually, the dam was rebuilt in its place, using the same general specifications as the original dam. In 1985, Howard's predecessors obtained approval from the City of Kerrville for a subdivision plat, known as the K–Bob Addition. This plat showed the contours of the UGRA easement burdening the property and contained the express condition that any flood way fill or development required prior certification by an engineer and approval by the City and the UGRA.

In August of 1989 Howard bought the disputed property. Howard concedes that, at the time of his purchase, he was aware of the 1980 agreement and easement. Sometime after Howard purchased his property, the City and the UGRA discovered that the 1982 FEMA flood plain maps did not account for the impact that the original dam had on the flood plain. Accordingly, in 1993, the City commissioned Epsey–Huston to determine the accurate contours and measurements of the flood plain. After its investigation, Espey–Huston issued a report to update the flood plain maps. The study indicated that the new dam had expanded the existing flood plain to 1646 feet m.s.l., which was above the level that Howard's property had been filled. After the Epsey–Huston report was published, the City petitioned FEMA to revise the map to include these changes. In addition, the City requested a separate delineation of the flood way and flood fringe for the Guadalupe River, the latter of which is subject to fewer development restrictions. As a result of the new study, the majority of Howard's land was removed from its prior designation as "flood way" and consigned to "flood fringe."

At approximately the same time Espey Huston published its study, Howard applied for a permit to build a shopping center on his property. Initially, Howard submitted his application to the City, but the City's staff recommended revisions. Howard apparently implemented those recommendations and then resubmitted his application to the City Council. After Howard's proposal was placed on the City Council's agenda, however, the City passed Ordinance No. 94–105, which declared a temporary moratorium on all land development believed to be in the expanded flood plain. The moratorium lasted approximately seven months. Howard's permit was therefore denied pending the outcome of the FEMA flood plain map revisions.

In 1995, Espey–Huston issued another report that indicated that the probable flow rate in the Guadalupe River was 215,000 c.f.s. and that the base flood elevation of Howard's property was 1648 feet m.s.l. As a result, the City Council passed anoth-

that the flood way was coterminous with the boundaries of the flood plain in the vicinity of Howard's land.

er ordinance, Ordinance No. 95–30, which expanded the scope of the moratorium to the new base flood elevation line. The City submitted the 1995 Espey–Huston study to FEMA and requested that the flood way and flood plain relative to the area upstream of the dam be revised in accordance with the new data.

In April 1997, FEMA published new findings of fact regarding the base flood elevation of the Guadalupe River, which took into account the presence of the dam and the increased flow rate of the Guadalupe River. The findings of the flood way and the base flood elevation were predicated upon a peak flood of 215,000 c.f.s. Because neither the City nor the UGRA appealed these findings, they became final by operation of law, on July 27, 1997. The 1997 base flood elevation determined for Howard's property was approximately 1648.5 feet, and so he was required to fill his property to the level of 1649.5 feet m.s.l. (the required base flood elevation plus one foot). After these new regulations were adopted, Howard did not ask the City to reconsider his original permit application. Howard later applied for a permit to build a used car dealership, but he subsequently withdrew that application claiming that the regulations were "too extraordinary to comply with."

On or about October 29, 1997, Howard notified the City and the UGRA, in writing, that the new water elevation exceeded the easement previously granted by Howard's predecessors in title and the new elevation requirement threatened his property with flooding. He also notified them that he intended to seek damages or injunctive relief if the threat of flood was not abated. The City and the UGRA never responded to his notice.

Therefore, in September 1998, Howard sued the City and the UGRA, alleging constitutional takings, threat of trespass, and breach of contract (to which Howard claimed to be a third party beneficiary). The City and the UGRA both filed motions for summary judgment on all claims against them. Howard filed a motion for partial summary judgment on his taking of an easement claim. The trial court granted the City's and the UGRA's motions, denied Howard's motion, and awarded the City and the UGRA attorney's fees. Howard now appeals the trial court's judgment on his takings claims under Article I, section 17 of the Texas Constitution and the award of attorney's fees.

## STANDARD OF REVIEW

■ We review a summary judgment *de novo*. *See Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 602 (Tex.App.-San Antonio 1995, writ denied). Under Rule 166a(c), summary judgment is proper when the summary judgment record establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law on a ground set forth in the motion. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Property Mgmt.Co.*, 690 S.W.2d 546, 548 (Tex.1985). A defendant moving for summary judgment must either (1) disprove at least one element of the plaintiff's theory of recovery, or (2) plead and conclusively establish each essential element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). The evidence must be viewed in the light most favorable to the nonmoving party and all contrary evidence and inferences must be disregarded. *Nixon*, 690 S.W.2d at 548.

■ "When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented." *FM Prop-*

*erties Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000). "The reviewing court should render the judgment that the trial court should have rendered." *Id.* "When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious." *Id.*

## DISCUSSION

### I. HOWARD'S TAKINGS CLAIMS

#### A. Taking of an Easement

 Howard's first claim is that the dam, built by the City and the UGRA in 1984, increased the base flood elevation on his property by six feet. Howard insists that this increase in the flood plain on his property and the subsequently established city ordinances, which regulate the flood plain, created an easement for public use and amounted to a physical taking of his property. Article I, Section 17 of the Texas Constitution provides, in pertinent part, that no "person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made...." TEX. CONST. art. I, § 17. To recover under Article I, Section 17 of the Texas Constitution, a claimant must establish that "the governmental entity intentionally performed certain acts that resulted in a 'taking' of the property for public use." *Bennett v. Tarrant Cnty. Water Control and Improvement Dist. Number One*, 894 S.W.2d 441, 448 (Tex. App.-Fort Worth 1995, writ denied). Under Texas law, a "'taking, damage, or destruction' is defined as physical appropriation or invasion of property, or unreasonable interference with a landowner's right to use and enjoy the property." *Du-Puy v. City of Waco*, 396 S.W.2d 103, 108–09 (Tex.1965).

A "taking" by flooding is a specific type of taking. The Texas Supreme Court, in *Brazos River Authority v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99 (1961), found that to establish a taking by flood, a claimant must show that the flooding occurred repeatedly or continuously. *Brazos River Auth.*, 354 S.W.2d at 107. More specifically, the *Brazos River Authority* court noted that,

the safer rule to follow is one requiring the plaintiff in actions such as this to establish definitely by evidence above the dignity of conjecture that the damage claimed is the result of a repeated and recurring injury rather than a sporadic one. Until a plaintiff is in [a] position so to establish the repetitious nature of the injury, he should be confined in his demand for damages to those flowing directly from the single injury or flooding.

*Id.* at 106–08; *see Tarrant Reg'l Water Dist. v. Gragg*, 43 S.W.3d 609 (Tex.App.-Waco 2001, pet. denid.)("[I]solated instances of increased flooding do not result in a 'taking'; 'repeated increased flooding' is required.").

 In this case, Howard alleges that the City and the UGRA have taken an easement because they built a dam that caused an increase in the base flood elevation or flood plain level on his property. But Howard has presented no evidence that his property was actually inundated with flood waters due to the dam. Therefore, Howard has failed to raise a genuine issue of material fact on whether his property was invaded by flood waters and so his physical takings claim must fail.

#### B. Regulatory Takings

 Howard contends that the City has engaged in a regulatory taking because it implemented flood plain regulations that deny him all economically viable uses of

his land. In the alternative, Howard claims that the City's ordinances have caused a partial regulatory taking because they dramatically reduce the available uses of his property and interfere with his reasonable investment-backed expectations. It is true that a compensable regulatory taking occurs when a governmental agency imposes restrictions that either deny a landowner all economically viable uses of his property or unreasonably interfere with a landowner's right to use and enjoy his property. *Mayhew v. The Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex. 1998). However, before a court can determine whether such a taking has occurred, the claim must be ripe for judicial review. The " 'ripeness doctrine' involves the issue of jurisdiction of the subject matter and power to render a particular relief." *City of El Paso v. Madero Dev.,* 803 S.W.2d 396, 400 (Tex.App.-El Paso 1991, writ denied); *see also State Bar of Texas v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994).

■■ "A controversy in administrative law is 'ripe' for the courts when it has 'legally matured' within its province." *Madero Dev.,* 803 S.W.2d at 398. "The ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Mayhew,* 964 S.W.2d at 928. "[I]n order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the property at issue," and "[a] 'final decision' usually requires both a rejected development plan and the denial of a variance from the controlling regulations." *Id.* at 929. A court requires a final and authoritative determination of the type and intensity of development legally permitted on the subject of the property because it "cannot [otherwise] determine whether a regulation has gone 'too far' unless it knows how far the regulation

goes." *Id.* In other words, "a court cannot determine whether a taking or other constitutional violation has occurred until the court can compare the uses prohibited by the regulation to any permissible uses that may be made of the affected property." *Id.*

■ Here, Howard only applied for a permit under the pre–1994 City regulations, but at the time, the City had issued a moratorium on development. After the City lifted the moratorium, Howard abandoned his application. The only other instance in which Howard attempted to apply for a permit was to build a car dealership, in 1996, but he later withdrew that application as well. Therefore, Howard has not completed the application process for any permit, under the post-moratorium ordinances that are the basis of his regulatory takings claims. In fact, Howard concedes that he has not made such an attempt because he believes the regulations are financially prohibitive. Because Howard has not completed any application process under the City's present ordinances, his regulatory takings claims are not ripe for judicial review.

In conclusion, we find that Howard's physical takings claim and his regulatory takings claims must fail. Accordingly, Howard's first point of error should be overruled.

## II. ATTORNEY'S FEES

■ In his second point of error, Howard argues that the trial court erred in awarding the City and UGRA attorney's fees because such fees are not recoverable for defending against a breach of contract claim. Under section 38.001 of the Texas Civil Practice and Remedies Code, a person may recover reasonable attorney's fees from an individual or a corporation, if he had lodged a claim with respect to:

(1) rendered services;

(2) performed labor;

(3) furnished material;

(4) freight or express overcharges;

(5) lost or damaged freight or express;

(6) killed or injured stock;

(7) a sworn account; or

(8) an oral or written contract.

TEX. CIV. PRAC. REM.CODE ANN. § 38.001 (Vernon 1997). To recover attorney's fees under this section, "a party must 1) prevail on a cause of action for which attorney's fees are recoverable, and 2) recover damages." *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997).

 In this instance, it is undisputed that neither defendant lodged counterclaims against Howard. In addition, the record shows that defendants did not lodge any claims for affirmative relief against Howard nor did they recover any damages in the suit. The statute does not allow an award of attorney's fees to a defendant for the successful defense of a lawsuit, and the parties have not cited any Texas case that would permit an award of fees in that circumstance. We find, therefore, that neither the City nor the UGRA were entitled to attorney's fees. Accordingly, we reverse and render that the City and the UGRA take nothing on their claim for attorney's fees.

### CONCLUSION

We affirm the trial court's judgment on Howard's takings claims, and we reverse and render on the issue of attorney's fees.