NUMBER 13-04-443-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


MONROE JOSHUA, VIC SALINAS

AND THOM JOSHUA ENTERPRISES,

L.L.C., Appellants,


v.



ROCKY C. SANDERS AND RICE

CREEK FARMS JOINT VENTURE, Appellees.

 


On appeal from the 267th District Court of Victoria County, Texas.


 


MEMORANDUM OPINION



Before Justices Hinojosa, (1) Yañez, and Rodriguez


Memorandum Opinion by Justice Yañez


 

 Appellants/Cross-Appellees, Monroe Joshua, Vic Salinas, and Thom Joshua
Enterprises, L.L.C. (collectively "appellants" or "cross-appellees"), appeal from a directed
verdict and jury's award of damages in favor of appellees/cross-appellants, Rice Creek
Farms Joint Venture and Rocky Sanders (collectively "appellees" or "Rice Creek"). By six
issues, appellants contend the trial court erred in: (1) declaring the Wells Fargo lease valid
because Rice Creek breached the lease by failing to farm in 2002 and 2003; (2) submitting
a jury question on Rice Creek's breach claim based on appellants' February 27, 2002
letter; (3) submitting a jury question on whether Rice Creek and appellants had agreed to
a 90/10 split of farm subsidy payments; (4) granting a directed verdict in Rice Creek's
favor; (5) conditioning the jury's consideration of appellants' breach claims on prior findings
by the jury that appellants either did not breach the lease or any such breach was excused;
and (6) refusing to (a) allow appellants an out-of-time counterclaim and (b) re-open
discovery. By two issues, Rice Creek challenges the jury's verdict awarding it zero
attorneys' fees. We (1) affirm the judgment in Rice Creek's favor, (2) reverse that portion
of the trial court's judgment denying Rice Creek its attorneys' fees, and (3) render judgment
awarding trial and appellate attorneys' fees as requested to Rice Creek.

Background


 In 1975, Sanders began leasing approximately 1,398 acres of farming and grazing
property in Victoria County, Texas, for the purpose of growing rice. (2) Sanders initially
leased the property from Josephine Joshua Salinas; following her death, he leased the
property from Wells Fargo Bank ("Wells Fargo"), (3) the trustee of the Salinas Trust ("the
Trust"). In July 1996, Wells Fargo "locked in" the rice-farming arrangement, which
generated income for the trust, by executing a ten-year lease with Sanders, (4) beginning
January 1997 and terminating December 31, 2006. As had been the case prior to 1996,
the lease provides that the landowner receives ten percent of the proceeds from the
harvesting of the rice crop and is obligated to pay ten percent of the cost of hauling the rice
to market, plus its share interest of the drying, storing, and related expenses. Rice Creek
bears all other expenses related to the rice farming and receives ninety percent of the
revenue from the crop.

 Rice Creek and Wells Fargo participated in and received federal farm subsidy
payments administered by the Farm Services Agency ("FSA"). In order to receive 
payment, both the lessor and lessee are required to sign a "Production Flexibility Contract,"
or "PFC," which authorizes the federal government to disburse the subsidy payment in a
specific ratio to the lessor and lessee as specified in the PFC. The record contains PFCs
for the years 1996, 1997, 1998, 1999, 2000, and 2001; each reflects that the subsidy
payments were allocated with Rice Creek, the lessee, receiving ninety percent and the
Trust, the lessor, receiving ten percent. (5) The lease itself states only that "[l]essee agrees
to comply with all government programs that Lessor shall approve," but does not address
how the subsidy payments are to be split between Rice Creek and the Trust. 

 The Trust dissolved by its own terms in 2000 and the trust property (which included
the acreage leased to Rice Creek) (6) passed to Vic Salinas, the sole beneficiary of the Trust. 
Salinas then conveyed fifty percent of his interest in the property to Monroe Joshua and
in turn, they formed Thom Joshua Enterprises, L.L.C., and conveyed their property to that
entity. 

 On February 26, 2002, Salinas and Joshua met with Sanders to discuss the terms
of the lease and distribution of FSA payments related to the leased property. Salinas
testified that he thought it was time "for a new contract or a new lease" because it had
been "27 years living under the same lease" and was "time for a change." (7) Joshua testified
that at the meeting, he proposed that the FSA payments should be split, with fifty percent
going to Rice Creek and fifty percent going to Thom Joshua Enterprises. Sanders asked
that Salinas and Joshua put their concerns in writing. 

 The following day, February 27, 2002, Salinas and Joshua sent Sanders a letter
which stated, in part:

Dear Rocky:


Please find enclosed the addendum to your Lease. In our conversation
dated February 26, 2002 we discussed our complete discontent in the lease
structured by Wells Fargo Bank. Both Vic Salinas and I are the current
owners of the 1397.86 acres of land in Victoria County, Texas. If you would
like to remain farming the above-mentioned lands the following is required,
and NON NEGOTIABLE.

 

1. Fifty percent (50%) of all United States Department of Agriculture FSA
Payment [sic]. As landowners we reserve that right. (Non Negotiable)


2. Fifteen percent (15% of all marketed rice sold from above mentioned
lands. This also includes 15% of the second harvest crop. 


The letter included several other demands, involving release of some of the acreage,
cattle-grazing, and hunting. The letter concluded by stating, "[w]e require a response within
10 days." 

 On March 21, 2002, Joshua and Salinas went to the FSA office and signed a PFC
providing that the payment be split 50/50 between themselves, with no share for Rice
Creek. Rice Creek contends that without the federal subsidy payments, it was
economically infeasible to plant for 2002, and it did not do so. 

 On April 2, 2002, Sanders and Rice Creek filed suit seeking (1) a declaratory
judgment that the lease was valid, (2) money damages for appellants' failure to pay the
2001 hauling bill, and (3) money damages for slander. Rice Creek subsequently withdrew
the claim for slander damages and added a claim for lost profit damages for 2002 and
2003. 

 The trial court set a trial date of August 11, 2003. On July 11, 2003, thirty days
before trial, appellants' counsel filed supplemental discovery responses, designating expert
witnesses. At a hearing on August 1, 2003, the trial court denied appellants' motion for
continuance and granted Rice Creek's motion to strike appellants' expert witnesses. On
August 4, 2003, appellants' counsel filed a second motion for continuance and a motion
to withdraw. At a hearing on August 8, 2003, appellants' counsel withdrew from the case. 
Following the hearing, the trial court granted a continuance, but barred appellants from
conducting discovery, amending their discovery responses, calling expert witnesses, or
amending their pleadings. The trial court denied appellants' motion to reconsider the
court's August 8 order, but it did allow appellants to depose Sanders. The trial court set
a trial date of February 16, 2004.

 After the jury began deliberations, it reported that it was "deadlocked" on Questions
1A and 2. Rice Creek moved for a directed verdict on Questions 1 (A and B) and 2. (8) The
trial court granted a directed verdict in Rice Creek's favor on both questions. Thus, the trial
court found (1) appellants breached the lease by (a) sending the February 27, 2002 letter
and (b) failing to pay the 2001 hauling fee, and (2) that Rice Creek and appellants had
agreed to a 90/10 split of the FSA payments for the duration of the lease. The jury found
that appellants' failures to comply with the lease were not excused. The jury awarded Rice
Creek damages in the amount of $75,457.14, but awarded it zero in attorneys' fees. (9) 

 Rice Creek filed a motion for entry of judgment on the jury's favorable findings and
motion to disregard the jury's findings regarding attorneys' fees. The trial court entered
judgment on the jury's verdict, found Rice Creek was entitled to 90% of all FSA payments
through the end of the lease, and awarded it $75,457.14 in damages, plus pre- and post-judgment interest. Both parties filed motions for new trial, which were denied by operation
of law. Appellants appealed and Rice Creek filed a cross-appeal. 

Standard of Review 


 In reviewing a directed verdict, an appellate court follows the standards for
assessing the legal sufficiency of the evidence. (10) The court should consider all evidence
in the light most favorable to the party against whom the verdict was instructed, crediting
favorable evidence if reasonable jurors could and disregarding contrary evidence unless
reasonable jurors could not. (11) The court may consider uncontradicted evidence favorable
to the movant. (12) 

 We decide whether there is any evidence of probative value to raise an issue of
material fact on the question presented. (13) When no evidence of probative force on an
ultimate fact element exists, or when the probative force of testimony is so weak that only
a mere surmise or suspicion is raised as to the existence of essential facts, a directed
verdict is proper. (14) The trial court should direct a verdict when reasonable minds can draw
only one conclusion from the evidence. (15) If the record contains any probative and
conflicting evidence on a material issue, a directed verdict is improper and the case must
be remanded for the jury to determine that issue. (16) If reasonable minds could differ as to
the controlling facts, a trial court errs if it grants a directed verdict and refuses to submit the
issues to a jury. (17) The reviewing court may affirm a directed verdict even if the trial court's
rationale for granting the directed verdict is erroneous, provided it can be supported on
another basis. (18) 

Analysis


 In their first issue, appellants contend the trial court erred in declaring the lease valid
and enforceable because Rice Creek materially breached the lease by failing to farm in
2002 and 2003. It is undisputed that Rice Creek did not farm in 2002 or 2003. Appellants
concede that the "only question" is whether Rice Creek's failure to farm was excused. The
jury was asked whether appellants' breach of the lease was excused by any prior material
breach by Rice Creek; the jury answered that it was not. Appellants argue there are two
possibilities that Rice Creek's breach by failing to farm was excused: (1) there was a prior
material breach by appellants, or (2) Rice Creek's performance under the lease was
rendered "impossible." Appellants argue that the first option "cannot prevail" because Rice
Creek was required to either (1) treat the contract as terminated and sue for damages, or
(2) treat the contract as continuing and sue for specific enforcement. According to
appellants, Rice Creek cannot both (1) insist that appellants perform and (2) use
appellants' prior breach as an excuse for its own non-performance. Thus, appellants argue
that even if they did commit a material breach of the lease prior to Rice Creek's failure to
farm, Rice Creek cannot claim appellants' prior breach as an excuse for its own failure to
farm. In support, appellants cite Chilton Ins. Co. v. Pate & Pate Enterprises, 930 S.W.2d
877, 888 (Tex. App.-San Antonio 1996, writ denied). 

 Appellants argue that the second possibility of excuse, impossibility of performance,
is also "foreclosed as a matter of law" because Sanders admitted in cross-examination that
it was "not impossible" for him to farm. Appellants cite Metrocon Const. Co. Inc. v. Gregory
Const. Co., Inc., 663 S.W.2d 460, 462 (Tex. App.-Dallas 1983, writ ref'd n.r.e), for the
proposition that performance of a contract is not excused simply because the contract is
more burdensome to perform than originally anticipated. 

 Rice Creek responds that its alleged breach of failure to farm in March 2002 was
excused by appellants' prior material breaches of failure to pay hauling fees (in 2001) and
the February 27, 2002 non-negotiable lease addendum. Rice Creek argues that both
events prevented it from farming in March 2002. 

 "Where . . . a party's performance is made impracticable . . . by the occurrence of an
event the non-occurrence of which was a basic assumption on which the contract was
made, his duty to render that performance is discharged . . . ." (19) We acknowledge that a
"mere change in the degree of difficulty or expense . . . , unless well beyond the normal
range, does not amount to impracticability . . . ." (20) Here, the record reflects that appellants'
February 27, 2002 letter, which imposed the "non-negotiable" demands that appellants take
fifty percent of FSA payments (instead of the ten percent that the parties had agreed to for
twenty-seven years) and fifteen percent of the proceeds from the rice crop (instead of the
ten percent as provided in the lease) constituted a change in the degree of expenses "well
beyond the normal range" and thus rendered Rice Creek's performance impracticable. (21) 
Although Sanders testified (as appellants argue) that it was "not impossible" for him to farm,
he also testified that he could not have farmed without the FSA payment. He also testified
that appellants' failure to pay the October 2001 hauling bill indicated that they did not intend
to honor the contract. We conclude that any alleged breach by Rice Creek in failing to farm
was excused by appellants' prior material breaches and that the trial court did not err in
declaring the lease valid and enforceable through 2006. We overrule appellants' first issue.

 In their second issue, appellants contend the trial court erred in submitting to the jury
the question of whether appellants breached the lease by sending the February 27, 2002
letter (Question 1A). In their third issue, appellants also contend the trial court erred in
submitting to the jury the question of whether Rice Creek and the Trust had agreed to split
the FSA payments, 90% to Rice Creek and 10% to the Trust, for the term of the lease
(Question 2). In their fourth issue, appellants contend the trial court erred in directing a
verdict in Rice Creek's favor on both questions. We address these issues together. 

 In their second issue, appellants argue that "mere expressions of intent to breach a
contract" do not constitute a breach. Appellants contend that "merely writing the February
27, 2002 letter" did not "violate a specific duty set forth in the contract," and therefore, no
question as to whether it constituted a breach should have been submitted. 

 Rice Creek responds that the sending of the February 27, 2002 letter was an
anticipatory repudiation of the lease. (22) An anticipatory breach occurs when a party
absolutely repudiates the obligation, without just excuse, and the other party is damaged
by the repudiation. (23) However, such an anticipatory repudiation of a contract may consist
of either words or actions by a party to a contract that indicates an intention that he is not
going to perform the contract according to its terms in the future. (24) Specifically, it is conduct
which evidences a fixed intention to abandon, renounce and refuse to perform the
contract. (25) Here, the "non-negotiable" demands in the February 27, 2002 letter showed that
appellants would no longer perform under the terms of the lease. (26) In addition, Salinas
testified that if Sanders did not accept the demands made in the letter, appellants were
going to "kick him off the property." Salinas also testified that by the letter, he "wanted to
break the lease."

 In their third issue, appellants contend the trial court erred in submitting a question
as to whether there was a course of dealing between Rice Creek and the Trust establishing
that the FSA payments were to be split 90% for Rice Creek and 10% for the Trust through
the term of the lease. Appellants argue that the trial court erred in submitting the question
because the apportionment of FSA payments was governed by written contracts entered
into each year by the parties. According to appellants, no "implied contract" could have
existed where written year-to-year contracts governed the distribution of FSA payments. 
Appellants cite Oliver v. Rogers, 976 S.W.2d 792, 807 (Tex. App.-Houston [1st Dist.] 1998,
pet. denied) ("When there exists a valid express contract covering the subject matter, there
can be no implied contract."). According to appellants, "submission of Question 2 to the jury
was erroneous, as a matter of law, because clear, unambiguous contracts were submitted
into evidence covering the subject of how FSA payments were to be distributed among the
parties, and during what time frame." As appellants acknowledge, the "clear unambiguous
contracts" submitted into evidence were the PFCs for the years 1996 through 2001. 

 It is undisputed that the lease does not govern the distribution of the FSA payments. 
However, as appellants acknowledge, the record shows that FSA payments were divided
90% to Rice Creek and 10% to the Trust for the crop years 1996 through 2001. At the
charge conference, the trial court acknowledged that:

There is no written agreement that covers the FSA. What the testimony of
Weempe is, on behalf of the trustees (27) and what the testimony of Mr.
Sanders is is that it's always split in compliance with the crop share
agreement.


* * * * *


As a matter of fact, in actuality, that agreement that they go down and sign
every year is nothing more than an authorization to the FSA to pay the FSA
allotment in compliance with the real agreement, which is implied between
the parties and has been in force for 27 years. It's nothing more than a
recording of the implied agreement that has been in place for 27 years. 


However, the trial court also stated, 


It is not-- the question is not was there an agreement. The question is was
the agreement that existed between the trust and the farmer, and you need
to say Rocky Sanders and Rice Creek Farms, controlling as to the new
landlords after they got the deeds to the property or after they took control
of the property. And I don't think that's as a matter of law, because they
[appellants] could have negotiated a different split because the lease is
silent. I mean, they could have gone-- if they had gone to Rocky Sanders
and said we want to renegotiate the split of the FSA payment, they could
have done that. 


 Question 2 asked: "Did [Rice Creek] and [the Trust] agree that the annual FSA
payments would be split 90% for [Rice Creek] and 10% for [the Trust] through the term of
the lease?" Here, William Weempe, manager of the Trust, testified that 

[the lease] sets out that the owners are to receive one-tenth crop share and
that's also split as far as the FSA payments on the same pro rata
percentage, as far as Rocky would get 90 percent of it, the landowner would
get 10 percent, and it's split just the same way that you receive your crop. 
We get one-tenth of the crop. 


 He also testified that: (1) while he was manager of the Trust, the FSA payments
were always divided 90% to Rice Creek and 10% to the Trust; (2) as manager of the Trust,
he felt he had no authority to change the division of FSA payments; and (3) that splitting
the FSA payments on the basis of the crop-share arrangement "was standard not only with
this lease but every lease that [he] did." Sanders testified that "normally," FSA payments
are split between the landowner and farmer on the same basis as the crop share
agreement between the parties. He also testified that "that's the way [Rice Creek and the
Trust] always shared [the FSA payments];" the payments "were always divided [by] crop
share; 90 percent Rice Creek Farms and 10 percent trust, Salinas Trust." 

 A contract may be explained or supplemented by the course of dealing of the
parties. (28) A course of dealing arises where the acts of the parties indicate a common
understanding as to the contract. (29) The UCC defines a course of dealing as "a sequence
of conduct concerning previous transactions between the parties to a particular transaction
that is fairly to be regarded as establishing a common basis of understanding for
interpreting their expressions and other conditions." (30) 

 We find appellants' reliance on Oliver v. Rogers to be misplaced. (31) Here, there are
no express agreements governing the allocation of the FSA payments for 2002 through
2006. The issue is whether by their course of dealing over twenty-seven years, Rice Creek
and the Trust agreed to split the FSA payments 90 percent for Rice Creek and 10 percent
for the Trust through the term of the lease. We concluded the trial court did not err in
submitting Question 2 to the jury.

 By their fourth issue, appellants contend the trial court erred in granting a directed
verdict in Rice Creek's favor on Questions 1 and 2. With respect to Question 1A,
appellants argue that based on Joshua's testimony, (32) the jury was entitled to believe that
a reasonable person receiving the February 27, 2002 letter would not have viewed the
letter as a "threat" or breach of the lease. With regard to Question 2, appellants direct us
to their counsel's closing argument, in which she argued to the jury that the 1996 through
2001 PFC contracts show that "if those parties wanted to come back and do something
different the next year, they could." We hold that considering all the evidence in the light
most favorable to appellants, there is no evidence of probative value to raise an issue of
material fact on the questions presented. (33) Accordingly, the trial court did not err in
granting a directed verdict in Rice Creek's favor on Questions 1 and 2. We overrule
appellants' second, third, and fourth issues.

 By their fifth issue, appellants contend that the trial court erred in instructing the jury 
to only address Question 4 (whether Rice Creek had breached the lease) if it had already 
determined that appellants had not breached or that any such breach by appellants was
excused. At the charge conference, the trial court determined that it was appropriate to
condition the question regarding Rice Creek's breach on the jury's answers regarding
appellants' breach because otherwise, the jury could decide that both parties breached and 
that neither breach was excused, resulting in what the trial court characterized as "the
worst possible mess." Appellants argue they are entitled to a new trial so that their breach
claims and Rice Creek's breach claims may be assessed "on an equal footing."

 The goal of a jury charge is to submit the issues for decision logically, simply,
clearly, fairly, correctly, and completely, and the trial court has broad discretion in
accomplishing that end as long as the charge is legally correct. (34) A trial court must submit
"such instructions and definitions as shall be proper to enable the jury to render a verdict." (35) 
A party is entitled to a jury question, instruction, or definition if the pleadings and evidence
raise an issue. (36)

 In support of their argument that the trial court erred in instructing the jury to
consider Rice Creek's alleged breaches conditionally, appellants cite this Court's opinion
in Ortega. (37) We find Ortega distinguishable from the present case. In Ortega, we found
that the jury charge was erroneous because the questions were improperly sequenced. (38) 
Here, however, the sequential order of the questions allowed the jury to consider the
issues logically and clearly. (39) If the jury had determined that appellants did not breach, or
that appellants' breach was excused, it was then instructed to consider whether Rice Creek
breached in all of the various ways alleged by appellants. We hold the trial court did not
abuse its discretion in conditioning the jury's answer to Question 4 on its answers to
Questions 1 and 3. We overrule appellants' fifth issue.

 In their sixth issue, appellants contend the trial court abused its discretion by
refusing to permit them to reopen discovery and amend their pleadings. Appellants
contend that their failure to conduct pre-trial discovery was the fault of their previous
counsel and that they should not be punished for his mistakes. (40) 

 A party who fails to make, amend, or supplement a discovery response in a timely
manner may not introduce into evidence the material or information that was not timely
disclosed, unless there is good cause for such failure or the failure to disclose will not
unfairly surprise or prejudice the other parties. (41) The trial court has discretion to determine
whether the offering party has met its burden of showing good cause. (42) 

 At the November 4, 2003 hearing on appellants' motion to reconsider, the trial court
stated:

Well, [appellants' counsel], the problem that I have and that you have is that
[appellants' prior counsel] indicated to me that he was ready to go to trial and
would have tried the case if it were reached, but for his clients' objection to
him representing them further. And so I am not going to allow you to join
another party and I'm going to maintain the order in force as it is.


* * * * *


 But Mr. Sanders and his case is not accountable to [appellants] and
shouldn't be burdened with the extra delay of having to go through and join
all these other parties and go through all this additional discovery at this time. 
I'm not going to make him do that. 


* * * * *


And so it's my choice. I'm going to try the first issue and see whether or not
there is a valid contract between Mr. Sanders and Mr. Joshua and his
partner, Mr. Salinas. If there is, then Mr. Salinas can go after the bank for
not representing him properly and he can also go after [appellants' prior
counsel] if [appellants' prior counsel] has cost him additional damages by his
misrepresentation. And I'm not denying [Mr. Salinas] any of his rights, I'm
just making him do it in a different setting.


 I'm not going to make this litigant pay extra money to participate in a
much larger, grander litigation scheme, which it would do. It would cost them
a lot more money to go forward with the bank and conduct the extra
discovery and all the other things that are associated within. I'm not going
to burden them with that cost. I'm going to let you have your day in court. 
And if I decide or the jury decides, however you do this, that that's a valid
lease, then you can sue those people you need to sue to recover all that
money, plus attorneys fees and everything else on behalf of Mr. Joshua.


* * * * *


I'll let you take Mr. Sanders' deposition one time and you already have the
trial exhibits. And, you know, I really-- I'm really stretching fairness and
letting you do that, but I do think it's fair that Mr. Sanders tell you what he
thinks about what's going on.


 After reviewing the record, we conclude the trial court did not abuse its discretion
in refusing to reconsider its August 8, 2003 order denying appellants' request to reopen
discovery and amend their pleadings. We overrule appellants' sixth issue.

Rice Creek's Claim for Attorneys' Fees


 As cross-appellant, Rice Creek requests this Court to reverse that portion of the trial
court's judgment that does not award it attorneys' fees and to render judgment for the full
amount of those fees. Rice Creek argues that because it prevailed on its breach of
contract claim and recovered approximately $75,000.00 in damages, it is entitled to its
attorneys' fees pursuant to section 38.001 of the civil practice and remedies code. (43) Rice
Creek claims it has proven its entitlement, as a matter of law, to attorneys' fees in the
amount of $288,000.00 in the trial court, $25,000.00 for appeal to this Court, $25,000.00
for the filing of a petition for review in the supreme court, and $10,000.00 for briefing and/or
oral argument to the supreme court. In the alternative, Rice Creek requests reversal of
only that portion of the judgment as to attorneys' fees and that only that part of the case
be remanded for a new trial.

Standard of Review and Applicable Law 


 A trial court's award of attorneys' fees is reviewed for an abuse of discretion. (44)
Attorney's fees are awarded under section 38.001 of the civil practice and remedies code
for a breach of contract claim. (45) When a prevailing party in a breach of contract suit seeks
attorneys' fees under section 38.001, makes its proof, and meets the requirements of the
section, an award of attorneys' fees is mandatory. (46) 

 To recover under section 38.001, a party must be a prevailing party and be awarded
damages. (47) A trial court has the discretion to set the amount of attorneys' fees, but it does
not have the discretion to completely deny attorneys' fees if they are proper under section
38.001. (48)

 It is the general rule that the testimony of an interested witness, such as a party to
the suit, though not contradicted, does no more than raise a fact issue to be determined
by the jury. (49) But there is an exception to this rule, which is that where the testimony of an
interested witness is not contradicted by any other witness, or attendant circumstances,
and the same is clear, direct and positive, and free from contradiction, inaccuracies, and
circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law. (50)

 However, even though evidence might be uncontradicted, if it is unreasonable,
incredible, or its belief is questionable, then such evidence would only raise a fact issue to
be determined by the trier of fact. (51) In order for the court to award an amount of attorneys'
fees as a matter of law, the evidence from an interested witness must not be contradicted
by any other witness or attendant circumstances and the same must be clear, direct and
positive, and free from contradiction, inaccuracies and circumstances tending to cast
suspicion thereon. (52) The court, as a trier of fact, may award attorneys' fees as a matter of
law in such circumstances, especially when the opposing party has the means and
opportunity of disproving the testimony or evidence and fails to do so. (53)

 A trial court may disregard a jury's negative finding and substitute its own affirmative
finding only if the evidence conclusively establishes such an affirmative finding as a matter
of law. (54) A zero award for attorneys' fees is proper if the evidence: (1) fails to prove (a)
that any attorneys' services were provided, or (b) the value of the services provided; or (2)
affirmatively shows that no attorneys' services were needed or that any services provided
were of no value. (55) 

 Rice Creek argues that Cale's Clean Scene Carwash, Inc. v. Hubbard, 76 S.W.3d
784, 787 (Tex. App.-Houston [14th Dist.] 2002, no pet.), supports its position that the jury's
award of "zero" for attorneys' fees would only be proper if the evidence established that "no
attorney's services were needed or that any services provided were of no value." (56) The
Cale's court reversed a jury's finding of "zero" attorneys' fees and rendered judgment in the
amount testified to, noting that the testimony supporting the reasonableness of the fees
was clear, direct, positive, and could have readily been contradicted and that there was no
testimony offered to controvert or impeach it. (57) 

 Jeff Migit, Rice Creek's counsel, testified at trial about the reasonableness of his
firm's fees. Migit testified as to the extensive discovery conducted by Rice Creek and the
expense of preparing for trial twice, once in August 2003, and again in February 2004, after
appellants were granted a continuance. Migit testified that as of the time of trial, attorneys'
fees totaled $288,000.00. Migit testified that this amount was reasonable and necessary
for the work provided. He also testified that although his billing rate is normally $335.00
per hour, his fees (and those of other attorneys working on the case) were discounted
twenty percent for Rice Creek and Sanders. He also testified that the reasonable and
necessary fees involved in an appeal to this Court would be $25,000.00, that the cost of
filing a petition for review in the supreme court would be $25,000.00, and the cost for
briefing and oral argument in the supreme court would be $10,000.00.

 Migit's testimony was uncontroverted. On cross-examination, cross-appellees/appellants repeatedly questioned the reasonableness of fees of a quarter million
dollars to handle a lawsuit "about a rice farm." Cross-appellees also elicited testimony from
Migit that his firm, Andrews & Kurth, does not have an office in Victoria, Texas, but does
have offices in major Texas cities, as well as in Los Angeles, New York, Washington, D.C,
and London. Cross-appellees question whether Migit "has any idea what lawyers in
Victoria would customarily charge for representation in a similar matter." Cross-appellees
also note that the attorneys' fees sought by Rice Creek are more than the damages alleged
in the case. (58) Cross-appellees argue that the jury was entitled to find Migit's testimony
"incredible" and to "refuse to rely on it in assessing a reasonable fee." No other evidence
was offered regarding the amount or reasonableness of Rice Creek's attorneys' fees.

 We hold that because Migit's testimony regarding Rice Creek's attorneys' fees is 
clear, positive and direct, and uncontroverted, it is taken as true as a matter of law. (59) We
hold that Rice Creek conclusively established the amount and reasonableness of its
attorneys' fees and render judgment in its favor for the full amount of its trial and appellate
attorneys' fees. We sustain Rice Creek's cross-point. 

Conclusion 


 We (1) affirm the judgment in Rice Creek's favor; (2) reverse that portion of the trial
court's judgment denying Rice Creek its attorneys' fees, and (3) render judgment awarding
trial and appellate attorneys' fees as requested to Rice Creek.


 

 LINDA REYNA YAÑEZ,

 Justice





Memorandum opinion delivered and filed 

this the 29th day of March, 2007.

1. The Honorable Federico G. Hinojosa, former Justice of this Court, did not participate in this opinion
because his term of office expired December 31, 2006. See Tex. R. App. P. 41.1(c).
2. Sanders's rice-farming company is Rice Creek Farms Joint Venture.
3. Wells Fargo Bank was formerly Norwest Bank Texas South Central, which in turn, was formerly
Victoria Bank & Trust Company.
4. Sanders assigned his interest in the lease to his company, Rice Creek Farms Joint Venture. 
5. Rice Creek and appellants agree that the deadline for participating parties to sign a PFC was
September; however, they disagree as to whether the September deadline applies to the current calendar year
or to the following year. For example, Rice Creek asserts that the PFC signed in December 1996 was for the
1997 crop year. Appellants contend that the September deadline applies "to the actual calendar year of
payment." We note that the record contains PFCs dated June 10, 1996 (labeled "1996 contract"), December
13, 1996 (reflecting initials in "1997" column), December 30, 1997 (labeled "1998 contract"), December 18,
1998 (labeled "1999 contract"), January 18, 2000 (labeled "2000 contract"), and November 20, 2000 (labeled
"2000 contract"), respectively. 
6. The total acreage of the trust property passed to Salinas was approximately 2,600 acres.
7. The terms of the lease had not changed significantly since 1975, when Sanders first signed a lease
with Josephine Joshua Salinas. 
8. Question 1A asked: "Did Defendants fail to comply with the Lease by . . . [a]ttempting to change
the terms of the Lease by sending the February 27, 2002 letter to Plaintiffs[?]"


 Question 1B asked: "Did Defendants fail to comply with the Lease by . . . [f]ail[ing] to pay Plaintiff 10%
of the cost for hauling harvested Rice from the Property to the market for the crop year 2001[?]"


 Question 2 asked: "Did Plaintiff and the Josephine Joshua Salinas Trust agree that the annual FSA
payments would be split 90% for Plaintiff and 10% for the Josephine Joshua Salinas Trust through the term
of the lease?"
9. The jury awarded Rice Creek (a) $1,120.14 in hauling fees, (b) $24,337.00 for Rice Creek's cost
to prepare the land for planting in 2002, and (c) $50,000.00 in lost profits for 2002 and 2003. 
10. See City of Keller v. Wilson, 168 S.W.3d 802, 823-27 (Tex. 2005) (stating that the test for legal
sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the
verdict, and appellate no-evidence review)
.
11. See id. at 827. 
12. See Nichols v. Nichols, 727 S.W.2d 303, 306 (Tex. App.-Beaumont 1987, writ ref'd n.r.e.).
13. Bostrum Seating, Inc. v. Crane Carrier Co., 140 S.W.3d 681, 684 (Tex. 2004); Szczepanik v. First
S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994).
14. Kingston v. Helm, 82 S.W.3d 755, 758 (Tex. App.-Corpus Christi 2002, pet. denied); Villarreal v.
Art Inst. of Houston, Inc., 20 S.W.3d 792, 796 (Tex. App.-Corpus Christi 2000, no pet.).
15. Vance v. My Apt. Steak House, Inc., 677 S.W.2d 480, 483 (Tex. 1984).
16. See Szczepanik, 883 S.W.2d at 649; White v. Southwestern Bell Tel. Co., 651 S.W.2d 260, 262
(Tex. 1983).
17. See Latham v. Castillo, 972 S.W.2d 66, 68 (Tex. 1998). 
18. Reyna v. First Nat'l Bank, 55 S.W.3d 58, 69 (Tex. App.-Corpus Christi 2001, no pet.); Villarreal, 
20 S.W.3d at 796. 
19. Centex Corp. v. Dalton, 840 S.W.2d 952, 954 (Tex. 1992) (citing Restatement (Second) of
Contracts § 261 (1981)). As this Court recently noted: 


"The Restatement says that the question of impracticability 'is generally considered to be
one of law rather than fact.'" Tractebel Energy Mtkg., Inc. v. E.I. DuPont DeNemours & Co.,
118 S.W.3d 60, 65-66 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (citing
Restatement (Second) of Contracts, ch. 11, introductory note, p. 310 (1981)). However,
"the very case cited by the Restatement in support of that position suggests it is a mixed
question of law and fact." Id. (citing Restatement (Second) of Contracts, ch. 11,
introductory note, p. 310 (1981); Mitchell v. Ceazan Tires, Ltd., 25 Cal. 2d 45, 153 P.2d 53,
54 (Cal. 1944) ("[impossibility] is a conclusion of law drawn by the court from the facts of a
given case.")).


BP Chems., Inc. v. AEP Tex. Cent. Co., 198 S.W.3d 449, 460 n.21 (Tex. App.-Corpus Christi 2006
no pet.). 
20. Restatement (Second) of Contracts § 261 cmt. d. (emphasis added).
21. See id.
22. Appellants contend that Rice Creek failed to raise anticipatory repudiation to the trial court and
therefore, should not be permitted to raise it on appeal. However, we conclude that Rice Creek is not
precluded from raising the issue on appeal. At the charge conference, the trial judge stated,


[Appellants are ] saying in the letter-- what [Rice Creek] can argue they're saying by the letter
and what the jury can infer from the letter is that [appellants] intend to abide by different--
they're saying this is what the lease is, if you want to farm for us this is what the lease is. In
fact, they even say this is an addendum to your lease. I mean, those words are legal words
of art that have specific meanings and if you're telling somebody this is an addendum to your
lease, you're telling them I have changed your lease, I'm the landowner, I have changed your
lease. I think that constitutes a breach. 
23. Hauglum v. Durst, 769 S.W.2d 646, 651 (Tex. App.-Corpus Christi1989, no writ). 
24. Id. 
25. Id. 
26. See id. 
27. William Weempe was the trust manager for Wells Fargo; he managed the Josephine Joshua
Salinas Trust. 
28. Tex. Bus. & Com. Code Ann. § 1.303 (Vernon Supp. 2006); see Preston Farm & Ranch Supply, Inc.
v. Bio-Zyme Enters., 625 S.W.2d 295, 298 (Tex. 1981). 
29. Tex. Bus. & Com. Code Ann. § 1.303(b); Tubelite, Div. of Indal, Inc. v. Risica & Sons, Inc., 819
S.W.2d 801, 804-05 (Tex. 1991). 
30. Tex. Bus. & Com. Code Ann. § 1.303(b). 
31. Oliver v. Rogers, 976 S.W.2d 792, 807 (Tex. App.-Houston [1st Dist.] 1998, pet. denied). 
32. Specifically, appellants refer to Joshua's testimony that after sending the letter, he "fully expected"
that Sanders would contact him. 
33. See City of Keller, 168 S.W.3d at 827; Bostrum Seating, Inc., 140 S.W.3d at 684.
34. Ortega v. LPP Mortg., Ltd., 160 S.W.3d, 596, 601 (Tex. App.-Corpus Christi 2005, pet. denied)
(citing Hyundai Motor Co. v. Rodriguez, 995 S.W.2d 661, 664 (Tex. 1999)). 
35. Id. (citing Tex. R. Civ. P. 277; Union Pac. R.R. Co. v. Williams, 85 S.W.3d 162, 166 (Tex. 2002)). 
36. Id. (citing Williams, 85 S.W.3d at 166). 
37. Id. at 601-02.
38. Id. 
39. See id. at 601.
40. Appellants' prior counsel admitted at the August 1, 2003 pre-trial hearing that the failure to timely
conduct pre-trial discovery was his "fault." Trial was initially scheduled for August 11, 2003. On July 11, 2003,
appellants filed Third Supplemental discovery responses, adding new fact witnesses and new experts. Rice
Creek filed a motion to strike the newly-named witnesses. Following the August 1, 2003 hearing, the trial
court granted Rice Creek's motion to strike and denied appellants' request for a continuance. Immediately
thereafter, on August 3, 2003, appellants' prior counsel filed a motion to withdraw, which the trial court granted
on August 8, 2003. The trial court gave appellants thirty days to find new counsel, but froze discovery. The
trial did not go forward on August 11, 2003. On October 24, 2003, appellants' new counsel requested that
the trial court reconsider its earlier ruling. Appellants requested permission to file an amended pleading
adding Wells Fargo Bank as a party and requested reopening of discovery. At the November 4, 2003 hearing,
the trial court refused to allow appellants to add the bank as a party and refused to reopen discovery, but did
allow appellants to depose Sanders. 
41. Tex. R. Civ. P. 193.6(a).
42. Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 914 (Tex. 1992).
43. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 1997).
44. Ragsdale v. Progressive Voters' League, 801 S.W.2d 880, 881 (Tex. 1990).
45. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 1997).
46. See Bocquet v. Herring, 972 S.W.2d 19, 20-21 (Tex. 1998); Welch v. Hrabar, 110 S.W.3d 601, 610
(Tex. App.-Houston [14th Dist.] 2003, pet. denied); see also Hoeffner, Bilek & Eidman, L.L.P. v. Guerra, No.
13-01-503-CV, 2004 Tex. App. LEXIS 4792, at *35 (Tex. App.-Corpus Christi May 27, 2004, pet. denied)
(mem. op.).
47. Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997); Howard v. City of Kerrville, 75 S.W.3d
112, 119 (Tex. App.--San Antonio 2002, pet. denied). 
48. See Jackson Law Office, P.C. v. Chappell, 37 S.W.3d 15, 23 (Tex. App.-Tyler 2000, pet. denied);
Essex Crane Rental Corp. v. Striland Constr. Co., 753 S.W.2d 751, 758 (Tex. App.-Dallas 1988, writ denied).
49. Ragsdale, 801 S.W.2d at 882.
50. Id. 
51. Id. 
52. Id. 
53. Id. 
54. Cale's Clean Scene Carwash, Inc. v. Hubbard, 76 S.W.3d 784, 786 (Tex. App.-Houston [14th Dist.]
2002, no pet.). 
55. Id. at 787.
56. Id. at 787.
57. Id. at 787-88.
58. In his response to this question on cross-examination, Migit stated that "it's not just the damages
that we're seeking, but also to give Mr. Sanders the opportunity to peacefully farm for the next three years
under the lease." 
59. See Ragsdale, 801 S.W.2d at 882.