# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===

## NO. 03-09-00417-CV

===

**Public Utility Commission of Texas; Luminant Energy Company LLC f/k/a TXU Portfolio Management Company LP; Luminant Generation Company LLC f/k/a TXU Generation Company LP; City of Austin d/b/a Austin Energy; City of San Antonio d/b/a/ CPS Energy, Reliant Energy Power Supply, LLC; and Lower Colorado River Authority, Appellants**

**v.**

**Constellation Energy Commodities Group, Inc., Appellee**

===

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-08-001213, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

===

## O P I N I O N

On November 14, 2006, Constellation Energy Commodities Group, Inc. ("Constellation") filed a complaint with the Public Utility Commission of Texas ("the Commission") against the Electric Reliability Council of Texas ("ERCOT") alleging that two of ERCOT's protocols[1] were contradictory and inconsistent and that ERCOT had improperly assessed charges against Constellation from April 10, 2006, to September 27, 2006, using the inconsistent protocols. Luminant Energy Company LLC f/k/a TXU Portfolio Management Company LP and Luminant Generation Company LLC f/k/a TXU Generation Company LP ("Luminant"), as well as City of

---

[1] ERCOT protocols are rules that provide the framework for the administration of the Texas electricity market. *BP Chemicals, Inc. v. AEP Tex. Cent. Co.*, 198 S.W.3d 449, 452 (Tex. App.—Corpus Christi 2006, no pet.).

Austin d/b/a Austin Energy, City of San Antonio d/b/a CPS Energy, Reliant Energy Power Supply, LLC, and Lower Colorado River Authority ("Joint Intervenors") intervened in the proceeding in support of ERCOT. After the Commission referred the case to the State Office of Administrative Hearings ("SOAH"), the administrative law judge ("ALJ") agreed with Constellation that the protocols in question were inconsistent and recommended the Commission require ERCOT to resettle the charges. The Commission rejected the ALJ's recommendation, determining instead that ERCOT had correctly settled the capacity insufficiency charges in accordance with the protocols then in effect. Constellation filed suit for judicial review in district court, which reversed the Commission's determination that ERCOT had correctly assessed the charges against Constellation. This appeal followed.

Luminant, the Joint Intervenors, and the Commission argue the district court erred by failing to defer to the Commission's construction of the protocols and its conclusion that ERCOT properly assessed charges. Luminant and the Joint Intervenors further contend Constellation's case is an impermissible collateral attack on a final Commission order. As a conditional cross-point, Constellation asserts ERCOT cannot assess an under-scheduling charge that is over and above its actual procurement costs.

For the reasons set forth below, we reverse the trial court's judgment and render judgment affirming the Commission's final order.

**FACTUAL AND PROCEDURAL BACKGROUND**

Since the implementation of retail choice in Texas in 2002, retail providers of electricity, in general, meet their customers' demand by entering into bilateral contracts with

2

generation owners and power marketers. ERCOT is the independent organization the Commission has certified as responsible for, among other things, ensuring the reliability and adequacy of the electric grid, as well as establishing, scheduling, and overseeing transaction settlement procedures. *See* Tex. Util. Code Ann. § 39.151 (West 2007).

Under ERCOT rules ("protocols") in effect on the disputed trade days, a qualified scheduling entity ("QSE") on the retailer's behalf engaged in bilateral contracts with generation owners and power marketers and submitted a schedule to ERCOT demonstrating that its expected demand was equal to the amount of generation it had procured to meet that demand. When the QSE's scheduled demand exceeded its scheduled supply or when its actual demand exceeded the amount of generation it had procured, the QSE was "under scheduled." QSEs under scheduled for several reasons: inaccurate load forecasting, a change in real-time conditions, or a strategic decision to rely upon ERCOT as a Resource to cover a portion of a QSE's Load.[2]

Consumption rarely matches generation exactly, so ERCOT's protocols authorized it to procure "ancillary service" to address actual or anticipated imbalances.[3] Ancillary services consist of various forms of "capacity"—the commitment of generation resources to be available for production in a given operating period—and "energy"—the real-time provision of electricity.

---

[2] "Resource" is defined as "facilities capable of providing electrical energy or Load capable of reducing, or increasing the need for electrical energy or providing Ancillary Services to the ERCOT System, as described in Section 6, Ancillary Services. This includes Generation Resources and Loads acting as Resources." ERCOT Zonal Protocols § 2.1 (March 1, 2006), *available at* http://www.ercot.com/mktrules/protocols/library/2006. "Load" is "the amount of electric power delivered at any specified point or points on a system." *Id.*

[3] "Ancillary services" are services "necessary to support the transmission of energy from Resources to Loads while maintaining reliable operation of transmission provider's transmission systems in accordance with Good Utility Practice." *Id.*

3

When a QSE under scheduled, ERCOT obtained ancillary services to address anticipated generation shortfalls.

QSEs were permitted to schedule purchases of power from generators located far from the demand or Load scheduled by the QSE. When too many of those transactions occurred, transmission routes between major consumption centers could become "congested."[4] The most commonly congested transmission routes effectively determined geographic "zones," usually identified by ERCOT as the North, West, South, and Houston zones, which required separate balancing by ERCOT. Congestion also prevented some inter-zonal transactions from occurring, which obligated ERCOT to procure expensive power in the zone where the load was scheduled to ensure that sufficient electricity existed to meet demand. Thus, when a QSE submitted a schedule that was balanced on a system-wide basis but unbalanced within one or more zones, ERCOT still might have incurred costs for ancillary services to resolve that intra-zonal capacity imbalance.

One of the ancillary services ERCOT used to resolve projected imbalances was a form of capacity called "replacement reserve service" ("RPRS"), which required an owner of an off-line generation resource to make that unit available for ERCOT's use, if necessary, during a particular hour of market operation. ERCOT procured RPRS through a day-ahead auction for each operating hour, and winning bidders were paid the market-clearing price for electricity.

---

[4] "Congestion" is defined as "the situation that exists when requests for power transfers across a Transmission Facility element or set of elements, when netted, exceed the transfer capability of such elements." *Id.* Congestion can be either local (within a zone) or zonal (between two or more zones).

Different ERCOT protocols controlled the procurement, compensation, and settlement of RPRS. Section 6.6, entitled "Selection Methodology," governed ERCOT's acquisition of various ancillary services. *See* ERCOT Zonal Protocols § 6.6 (March 2006 Protocols Update 2, March 21, 2006), *available at* http://www.ercot.com/mktrules/protocols/library/2006.[5] Section 6.6.3.2.1, "Specific Procurement Process Requirements for [RPRS] in the Adjustment Period" (hereinafter the "RPRS procurement protocol"), detailed the circumstances and process under which ERCOT obtained RPRS for each operating hour. *See id.* § 6.6.3.2.1. That protocol required ERCOT to procure RPRS to rectify capacity insufficiency, zonal transmission congestion, and local transmission congestion.

Because it costs a generator money to start up a unit and keep it running at the minimum level necessary to ensure that power could be delivered if customer load demanded more energy, ERCOT's procurement of RPRS capacity resulted in costs, regardless of whether any energy from the committed Resource was actually sold on the market. Even though a QSE submitted a schedule that was balanced on a system-wide basis, ERCOT may also have incurred costs if the schedule was imbalanced within one or more zones. Those costs occurred because, to balance a particular zone, ERCOT may have procured power from a generator within that zone that was more expensive than if a generator from outside the zone had been utilized. If ERCOT procured RPRS, it made a payment to the QSE providing the service according to the methods and formulas specified in section 6.8, "Compensation for Services Provided." *See id.* § 6.8.

---

[5] All subsequent citations to section 6 of ERCOT Zonal Protocols, entitled "Ancillary Services," were effective March 21, 2006.

Section 6.9, "Settlement for ERCOT-Provided Ancillary Services," contained the mathematical formulas ERCOT utilized to calculate RPRS settlement, that is, the charges ERCOT levied against the QSEs for procuring RPRS. *See id.* § 6.9. Protocol 6.9.2.1, entitled "Settlement for RPRS," set forth formulas for two different charges related to RPRS: an under-scheduling charge and an uplift charge. *See id.* §§ 6.9.2.1, 6.9.2.1.1, 6.9.2.1.2. Before being amended in October 2006, the formula set forth in section 6.9.2.1.1, entitled "Replacement Reserve Under-Scheduled Capacity" (hereinafter, the "RPRS under-scheduled settlement protocol"), required a direct assessment of charges to a QSE that scheduled short in any zone if ERCOT actually procured RPRS. *See id.* § 6.9.2.1.1. Although the formula sometimes resulted in an under-scheduling charge that was less than ERCOT's total RPRS procurement costs, often the charge was greater than the cost that ERCOT had incurred in procuring RPRS to remedy the projected capacity insufficiency. *See id.*

The second part of the RPRS settlement protocol, section 6.9.2.1.2 (entitled "Replacement Reserve Uplift Charge"), provided the formula that "uplifted" (or "socialized") any remaining RPRS costs (or any over-recovered balance) among all QSEs.[6] *See id.* § 6.9.2.1.2. The protocol calculated the uplift charge by (1) summing the costs of RPRS for local congestion, zonal congestion, and capacity insufficiency and then (2) subtracting out the payments received through the under-scheduling charge and the zonal congestion charge. *See id.* The remaining cost balance, whether positive or negative, was uplifted to all QSEs according to load-ratio share. The uplift

---

[6] "Uplift" is defined as "the process of allocating costs to QSEs based on Loads and exports within the ERCOT Region." ERCOT Zonal Protocols § 2.1 (March 1, 2006).

charge formula provided that, whenever the total amount of under-scheduling charges in section 6.9.2.1.1 was less than ERCOT's costs for providing RPRS, the remaining costs were socialized among QSEs by load-ratio share. *See id.* Likewise, whenever the total amount of under-scheduling charges was greater than ERCOT's costs, the excess recovery was distributed among the QSEs by load-ratio share. *See id.*

ERCOT assessed under-scheduling charges of approximately $3.8 million against Constellation for the trade days in question, in accordance with the formula set forth in section 6.9.2.1.1. *See id.* § 6.9.2.1.1. Constellation disputed the charges. After ERCOT denied Constellation's complaint, Constellation appealed to the Commission, alleging that ERCOT had erroneously calculated the under-scheduling charges based on Constellation's zonal-capacity insufficiency instead of its system-wide shortfall. Constellation conceded that section 6.9.2.1.1 required calculation of under-scheduling charges on a zonal basis, but argued the RPRS procurement protocol (section 6.6.3.2.1) indicated that QSEs were intended to incur RPRS costs for capacity insufficiency only if they were system-wide, not merely in a zone. *See* §§ 6.6.3.2.1, 6.9.2.1.1. Constellation proposed that, in order to calculate the "correct" charges, the Commission should ignore the RPRS under-scheduled settlement protocol (section 6.9.2.1.1) and uplift the cost of capacity insufficiency to the entire market on a load-ratio share basis as set forth in section 6.6.3.2.1(9) (the "uplift solution"). *See id.*

After the Commission referred the matter to SOAH, the ALJ granted summary disposition in Constellation's favor, agreeing that the under-scheduling charges should have been calculated using the uplift solution. The ALJ found that the RPRS procurement protocol

7

(section 6.6.3.2.1) and the RPRS under-scheduled settlement protocol (section 6.9.2.1.1) were "inconsistent and contradictory" and that the RPRS procurement protocol should have been applied strictly as written, that is, the cost of allocation uplifted to all QSEs based on load-ratio share. The ALJ noted that, although ERCOT had made no mathematical errors in applying the formula set forth in the RPRS under-scheduled settlement protocol, "that formula was incorrectly written to charge RPRS capacity insufficiency costs on a zonal basis rather than on a Load Share [basis]" as the RPRS procurement protocol required. The ALJ recommended the Commission order ERCOT to resettle the contested trade days by uplifting on a load-ratio share basis the RPRS cost for capacity inadequacy as "all other costs" [sic] in subsection (9) of the RPRS procurement protocol, section 6.6.3.2.1. *See id.* § 6.6.3.2.1(9). Section 6.6.3.2.1(9) read as follows:

> If all of the cost of RPRS is not allocated by one of the above methods, then the allocation will be uplifted to all QSEs based on the Load Ratio Share for the relevant period. If ERCOT collects more RPRS costs in this manner than are necessary, the excess funds collected by ERCOT will be credited to all QSEs based on the Load Ratio Share for the relevant period.

*Id.* § 6.6.3.2.1(9).

The Commission disagreed with the ALJ's analysis. It concluded the protocols were harmonious and not in conflict. It further stated that "ERCOT correctly settled the capacity insufficiency charges for the disputed operating dates in accordance with the Protocols then in effect and that no resettlement should occur." The Commission also determined that "ERCOT correctly applied the formula as written at that time and that a protocol revision request (PRR) was

later utilized to modify the protocol to avoid the consequences of applying the zonal factor as the formula previously required."

Constellation sought judicial review. The district court found that the RPRS under-scheduled settlement protocol (section 6.9.2.1.1) and the RPRS procurement protocol (section 6.6.3.2.1) were in "irreconcilable conflict" and that the RPRS procurement protocol was the "special or specific Protocol that must be given controlling effect in this case." *See id.* §§ 6.6.3.2.1, 6.9.2.1.1. The court reversed the Commission's order, concluding that, because ERCOT did not give controlling effect to the RPRS procurement protocol but instead calculated Constellation's RPRS charges using the RPRS under-scheduled settlement protocol, ERCOT failed to correctly settle the RPRS charges. This appeal followed.

**DISCUSSION**

**Commission's Interpretation of ERCOT Protocols**

ERCOT protocols are rules that provide the framework for the administration of the Texas electricity market. *BP Chemicals, Inc. v. AEP Tex. Cent. Co.*, 198 S.W.3d 449, 452 (Tex. App.—Corpus Christi 2006, no pet.). ERCOT protocols, however, are subject to Commission oversight and review. Tex. Util. Code Ann. § 39.151(d); *see also id.* (g) (Commission must approve protocols and protocols must reflect Commission's input). An agency's interpretation of a rule becomes part of the rule itself and represents the view of the regulatory body that must administer it. *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 604 (Tex. App.—Austin 2000, pet. denied).

9

Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Because they have the force and effect of statutes, we construe administrative rules in the same manner as statutes. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). "Unless the rule is ambiguous, we follow the rule's clear language." *Shumake*, 199 S.W.3d at 284.

We also must give "serious consideration" to the construction of a statute by the administrative agency charged with its enforcement. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). In our "serious consideration inquiry," we will generally uphold an agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent with the text of the rule. *See id.* at 625.

The supreme court has observed that deference to an agency's interpretation is "tempered" by several considerations. *See id.* First, deference "applies to formal opinions adopted after formal proceedings, not isolated comments during a hearing or opinions [in a brief]." *Id.* (quoting *Feiss v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006). Second, the language at issue must be ambiguous. *Feiss*, 202 S.W.3d at 747. Third, the agency's construction must be reasonable. *Id.* at 747-48.

When a statutory scheme is subject to multiple understandings, that is, ambiguous, we must uphold the enforcing agency's construction of its statutory scheme if is reasonable and in harmony with the statute. *See Texan Citizens*, 336 S.W.3d at 629. This deference is particularly important in a complex regulatory scheme like the Public Utility Regulatory Act. *See id.* at 629-30.

Accordingly, we must determine whether the Commission's interpretation of the ERCOT protocols in question is plainly erroneous or inconsistent with the text of the protocols and defer to the Commission's construction of its regulatory scheme if is reasonable and in harmony with the statute.

The Commission, the Joint Intervenors, and Luminant (collectively, "appellants") assert the district court erred in rejecting the Commission's conclusion that ERCOT properly assessed RPRS under-scheduling charges to Constellation in accordance with the under-scheduled capacity formula set forth in section 6.9.2.1.1, the RPRS under-scheduled settlement protocol. *See* ERCOT Zonal Protocols § 6.9.2.1.1. Appellants contend the district court failed to give deference to the Commission's construction of the RPRS procurement protocol (section 6.6.3.2.1) and the RPRS under-scheduled settlement protocol, as well as the Commission's conclusion that the two protocols were not in conflict but were harmonious. *See id.* §§ 6.6.3.2.1, 6.9.2.1.1.

Contrary to Constellation's assertion that ERCOT erroneously calculated under-scheduling charges based on Constellation's zonal-capacity insufficiency instead of its system-wide shortfall and that the RPRS procurement protocol (section 6.6.3.2.1) indicated that QSEs were intended to incur RPRS costs for capacity insufficiency only if they were system-wide, Luminant argues the version of the RPRS under-scheduled settlement protocol in effect during the relevant market days required measurement of under-scheduling charges on a zonal, not on a system-wide, basis. *See id.* It asserts that no other ERCOT protocol addressed the imposition of charges to a QSE that under scheduled, either in a zone or otherwise.

11

Luminant contends that, contrary to what the district court found, the RPRS procurement protocol said nothing about the consequences to a QSE for under scheduling capacity in a zone. *See id.* § 6.6.3.2.1. The Joint Intervenors likewise argue that section 6.6.3.2.1 neither prohibited ERCOT from imposing under-scheduling charges, nor did that protocol even address the obligations of capacity-short QSEs. *See id.* Rather, Luminant contends, section 6.6.3.2.1 merely specified when and how ERCOT had to procure RPRS in the first place and summarized ERCOT's duty to uplift (or "socialize") any under- or over-collected RPRS costs. *See id.* Luminant argues that, because the under-scheduled capacity formula in section 6.9.2.1.1 was the only provision that specified the economic consequences of under scheduling capacity in a zone and that provision was clear and unambiguous, the district court erred in looking beyond the RPRS under-scheduled settlement protocol. *See id.* § 6.9.2.1.1.

The Commission also argues that the protocol that most specifically addressed the issue of the appropriate means of RPRS settlement was section 6.9.2.1.1. *See id.* Only the RPRS under-scheduled settlement protocol included the precise details of how RPRS settlement was to be carried out. Indeed, notes the Commission, section 6.9.2.1.1 contained three pages of equations and variables determining the method of settlement, compared with one sentence in subsection 9 in the RPRS procurement protocol.[7] *See id.* §§ 6.6.3.2.1(9), 6.9.2.1.1.

In response, Constellation asserts that the formula in section 6.9.2.1.1 conflicted with the RPRS procurement protocol. Constellation contends that, because subsection (9) of the RPRS

---

[7] "If all of the cost of RPRS is not allocated by one of the above methods, then the allocation will be uplifted to all QSEs based on the Load Ratio Share for the relevant period." ERCOT Zonal Protocols § 6.6.3.2.1(9).

procurement protocol (section 6.6.3.2.1) required an uplift of RPRS insufficiency costs on a load-ratio share basis, whereas the RPRS under-scheduled charge formula in section 6.9.2.1.1 directly assigned a charge to QSEs under-scheduled in any zone, the two protocols conflicted. *See id.*

However, the Joint Intervenors argue no inconsistency existed between ERCOT uplifting remaining RPRS costs on a load-ratio share basis and imposing a charge on capacity-short QSEs that had benefitted from under scheduling.[8] They contend that, because a distinction exists between "charges" and "costs," the district court failed to understand that the RPRS under-scheduled settlement protocol and the RPRS procurement protocol harmoniously coexisted. The Joint Intervenors assert the RPRS settlement protocol, section 6.9.2.1, had two parts: section 6.9.2.1.1, which described and calculated under-scheduled capacity charges to capacity-short QSEs, charges not intended to match ERCOT's exact procurement costs; and section 6.9.2.1.2, which contained the uplift formula through which ERCOT's RPRS procurement costs and under-scheduled capacity charges were netted. *See id.* §§ 6.9.2.1, 6.9.2.1.1, 6.9.2.1.2.

Subpart 10 of section 6.3.1, entitled "ERCOT Responsibilities," read, in pertinent part, as follows: "ERCOT will not profit financially from the market." *Id.* § 6.3.1(10). Because that protocol required ERCOT to be a revenue-neutral entity, the Joint Intervenors point out that all costs and revenues had to be returned to market participants. They assert the formula in section 6.9.2.1.2

---

[8] A QSE could decide if the economic benefit of likely achieving a lower price in the real-time market made under-scheduling worth its known risks, that is, under-scheduled charges. QSEs knew that, if other QSEs scheduled "long," that is, scheduled capacity in excess of what was required to meet their delivery obligations, ERCOT might not need to procure RPRS. And if ERCOT did not procure RPRS, then no under-scheduling charges would be assessed against those QSEs that intentionally scheduled less capacity than needed to meet their delivery obligations.

incorporated the RPRS procurement *costs* that ERCOT incurred and the RPRS under-scheduling *charges* that ERCOT collected. *See id.* § 6.9.2.1.2. The Joint Intervenors contend that, pursuant to the formula in section 6.9.2.1.2, ERCOT netted the cost of RPRS procurement with any RPRS under-scheduling charges collected, and the uplift charge to each QSE was calculated based on its own load-ratio share. *See id.* Thus, the uplift charge achieved the socialized distribution of excess costs or receipts referenced in subsection (9) of section 6.6.3.2.1, the RPRS procurement protocol. *See id.* §§ 6.6.3.2.1, 6.9.2.1.2.

We hold that the Commission's interpretation of section 6.9.2.1.1, the RPRS under-scheduled settlement protocol, was consistent with the protocol's plain language. *See id.* § 6.9.2.1.1. Section 6.9.2.1.1 specifically authorized ERCOT to impose under-scheduling charges on a QSE that scheduled short in any zone, and the Commission's order accurately concluded that ERCOT settled the capacity insufficiency charges assessed to Constellation in accordance with the text and formula set forth in section 6.9.2.1.1. *See id.*

We further hold the district court erred in finding that the RPRS procurement protocol and the RPRS under-scheduled settlement protocol were in irreconcilable conflict. *See id.* §§ 6.6.3.2.1, 6.9.2.1.1. As Luminant pointed out, the under-scheduling charge was based, in part, on the market clearing price for capacity ("MCPC") for insufficiency defined in subsection (6)(a) of the RPRS procurement protocol, which read as follows:

> The marginal cost (Shadow Price of the power balance constraint) to solve system insufficiency defines MCPC for insufficiency.

*Id.* § 6.6.3.2.1(6)(a); *see also* § 2.1 (definition of "market clearing price for capacity"). The Commission in its order noted that "subsection (6) of Protocol § 6.6.3.2.1 [the RPRS procurement protocol] speaks to capacity insufficiencies and provides a factor for insufficiency that is included in the formula for calculating charges to under-scheduled [QSEs] on a zonal basis in Protocol [section 6.9.2.1.1]." *See id.* §§ 6.6.3.2.1, 6.9.2.1.1. The Commission thus harmonized the RPRS procurement protocol and the formula in the RPRS under-scheduled settlement protocol and concluded the protocols did not conflict. *See id.* Finding that the Commission's construction of this regulatory scheme is reasonable and in harmony with the statute, we hold the district court erred in failing to defer to the Commission's interpretation.

Finding that the Commission's order accurately concluded that ERCOT settled the capacity insufficiency charges assessed to Constellation in accordance with the text and formula set forth in section 6.9.2.1.1, the RPRS under-scheduled settlement protocol, and that the RPRS procurement protocol and the RPRS under-scheduled settlement protocol did not conflict, we sustain appellants' first issue.

Having sustained appellants' first issue, we need not reach Luminant's and the Joint Intervenors' second issue.

**Constellation's Cross-Point**

The district court concluded that "[the Commission] and ERCOT did not act outside the scope of their statutory authority by overcharging for RPRS procurement." As a conditional cross-point, Constellation asserts that, if the court's conclusion is interpreted to mean that ERCOT had the authority to intentionally impose a charge over and above ERCOT's actual procurement

15

costs, that conclusion is in error. Constellation argues ERCOT only had authority to charge QSEs for ERCOT's actual costs of procuring RPRS to resolve capacity insufficiency. It contends that the formula in the RPRS under-scheduled settlement protocol "cannot, as a matter of law, be interpreted to allow ERCOT to assess a charge over and above its actual costs." *See id.* § 6.9.2.1.1. We disagree.

As the Commission has noted, no statute, rule, or protocol demanded that ERCOT's under-scheduling charges correlate exactly with its costs in procuring RPRS. Although it often assessed an under-scheduling charge that was greater than its procurement costs, ERCOT retained no cost excess from the under-scheduling charge. Rather, as required by section 6.9.2.1.2, ERCOT uplifted any excess to the market, thus remaining revenue neutral as required by section 6.3.1(10). *See id.* §§ 6.3.1(10), 6.9.2.1.2. Constellation's cross-point is overruled.

## CONCLUSION

Having sustained appellants' first issue, we reverse the district court's judgment and render judgment affirming the Commission's order that determined ERCOT had correctly assessed under-scheduling charges against Constellation for the period April 10, 2006, to September 27, 2006.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Rendered

Filed: September 28, 2011

16